The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Paul FISH, Defendant-Appellee.

No. 82SA438.

Supreme Court of Colorado, En Banc.

March 14, 1983.

Warwick Downing, Dist. Atty., Cortez, for plaintiff-appellant.

Merlo & Merlo, P.C., Samuel J. Merlo, Cortez, for defendant-appellee.

NEIGHBORS, Justice.

This is an interlocutory appeal. The People challenge the trial court's order suppressing one of two incriminating statements made by the defendant. We affirm.

The defendant is charged in an amended information filed in the District Court for Montezuma County with two counts of first-degree murder.[1] The People allege that the defendant killed Lawrence Rignal Robinson, Jr. (Big Larry) and Lawrence Rignal Robinson, III (Little Larry) on January 11, 1982, at their residence east of Totten Lake near Cortez, Colorado. The defendant's younger brother, John Albert Fish (Bert), was also killed during the episode.

The authorities were notified of the incident by the defendant on January 11, 1982. The defendant called the Justice Building switchboard in Cortez at 4:11 a.m. He requested that officers and an ambulance be sent to the scene immediately because there had been "shots fired" and "some people killed." The defendant identified himself to the state patrol dispatcher at the Justice Building and gave the dispatcher a telephone number. The defendant was unable to provide a county road or house number. The dispatcher described the defendant's emotional state as "very emotionally disturbed, . . . not to the point of being out of his mind, but . . . a very sense of urgency in his voice, very pleading." After calling the dispatcher, the 19-year-old defendant

---

1. Counts one and two each allege that the defendant committed murder after deliberation in violation of section 18–3–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8).

attempted to contact his parents. He was unable to reach them. The defendant telephoned a friend who in turn contacted the defendant's mother and father. The defendant again called the dispatcher at 4:17 a.m. During that conversation, he described the house in which the shootings had taken place.

Officer Brent Powell was sent to the Robinson residence and arrived at 4:21 a.m. Officer Powell entered the house. His description of the defendant is as follows:

"Paul had his fists doubled up at the time and was stooping over and up and he was breathing real hard, erratic, just—(indicating air whooshing in and out)—such as that."

Officer Powell was directed by the defendant to a bedroom where Big Larry was present. The officer noted that Big Larry had been shot and had a very weak pulse. The defendant then took Officer Powell to a second bedroom in which the bodies of Little Larry and Bert were located. Officer Powell asked the defendant if he was in the residence when the shooting started. The defendant replied: "Yes. Larry Robinson, Jr. shot my brother, Bert. I then shot Larry Robinson, Jr. and ran into the other bedroom and shot Larry Robinson, Sr." [2] Officer Powell arrested the defendant and placed handcuffs on him. While he was still at the Robinson residence in handcuffs, the defendant's parents called and asked to speak to him. The request was refused by Officer Powell. The defendant's parents were told that he was being taken to jail and they could talk with him there.

At 4:26 a.m., Officer Krause arrived and transported the defendant to the Montezuma County Jail. On the way to the jail, Officer Krause and the defendant engaged in general conversation. During the conversation the defendant asked him "to notify Stan Chaffin because he was working with me on the case." Officer Krause described the defendant as being nervous but not hysterical. The defendant and Officer

Krause arrived at the jail at approximately 4:40 a.m. The defendant was placed in a holding cell which did not have water or bathroom facilities. The defendant was denied access to water to prevent him from washing his hands until after they were tested for scientific evidence.

Sometime shortly after 5:40 a.m., Officer Ronald Barker came to the holding cell in which the defendant had been placed. Officer Barker obtained swabbings from the defendant's hands and seized his clothing. The officer then took the defendant to the hospital for the purpose of obtaining a blood sample so that an alcohol and a drug screen could be obtained. Since the defendant had not been advised of his *Miranda* rights, Officer Barker did so at approximately 6:15 a.m. Officer Barker testified that the defendant was extremely calm and composed and was not under the influence of drugs or alcohol. The officer indicated that the defendant's motor movements were unimpaired, even while walking on ice with his ankles in leg irons.

At approximately 7:30 a.m., Sgt. Stan Chaffin and Sheriff John Glazner interviewed the defendant. The defendant was taken to a secretary's office for the interrogation. The room was located in the basement of the Justice Building and was secluded. The officers talked with the defendant before starting the tape machines used to record the interview. The officers used both a primary and a backup machine to record the interview. There is a conflict in the evidence about the contents of the pre-recording conversation between the defendant and the interrogating officers. The defendant testified that while being advised of his *Miranda* rights, he asked the officers if he needed an attorney and one or both of the officers said "no." Both officers denied that any such conversation occurred. It is undisputed that during the course of the interview, the officers told the defendant that "we need to know everything" and "we've got to have the truth for *your protection.*" (Emphasis added.)

---

**2.** The trial court determined that this statement was voluntary. Accordingly, the admissibility

of the statement is not an issue in this appeal.

It is clear from the record that the tape recordings of the interrogation do not contain all of the conversations between the defendant and the officers. The backup tape contains more recorded dialogue than the primary recording.

The record establishes that the sheriff's department suspected Big Larry of dealing in narcotics and dangerous drugs. The defendant had been arrested on a forgery charge in November of 1981. He was granted a personal recognizance bond after he agreed to be an informant for Sgt. Chaffin. The trial court found that the defendant "offered to help the sheriff get Robinson (Big Larry) in return for the charges being dropped plus getaway money." The defendant had lived with Big Larry for approximately one year prior to the killings. The plan devised by Sgt. Chaffin was to have the defendant introduce an undercover officer, Bill McCash, to Big Larry for the purpose of purchasing narcotics or other drugs. The undercover officer told the defendant that the situation was dangerous, there might be some shooting and the defendant "should keep a gun handy." The defendant then began carrying the .22 caliber pistol which was used in the killings. The defendant was also told by Officer Jim Kindle on January 5, 1982, that "in a way, you are working for us."

The defendant testified that he agreed to talk to the interrogating officers because he thought he was "working undercover" for them and that he was not "suspected of anything except for self defense." During the course of the interview, the defendant made incriminating statements to the officers.

The defendant was not permitted to speak to his parents until after the interrogation was concluded. The defendant's parents had arrived at the jail shortly after the defendant was placed in the holding cell. They were told by jail personnel to wait. After the interrogation was completed, the defendant talked with his mother by telephone. He again asked Sheriff Glazner and Sgt. Chaffin whether he needed an attorney. They replied in the affirmative. The defendant's parents then retained counsel for the defendant. The police requested that the defendant take a lie detector test. The defendant refused until he could confer with his attorney.

The defendant filed a motion to suppress the contents of the two oral statements. The motion was denied with respect to the first statement made to Officer Powell. However, the statement given to Sheriff Glazner and Sgt. Chaffin was suppressed. It is from that order that the People appeal.

## I.

In analyzing a motion to suppress a confession under our present case law, the trial court is required to proceed with a two-step analysis. The court must first answer the question: Did the defendant knowingly, voluntarily and intelligently waive his right to counsel and right against self-incrimination? The burden of proof is on the prosecution to prove by clear and convincing evidence that the defendant waived his constitutional rights. *People v. Lowe,* 200 Colo. 470, 616 P.2d 118 (1980). *See also People v. Traubert,* 199 Colo. 322, 608 P.2d 342 (1980).

The second question which must be answered is: Was the defendant's confession voluntary? The burden of proof is on the prosecution to establish by a preponderance of the evidence considering the totality of the circumstances that the inculpatory statement was made voluntarily. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *People v. Fordyce,* 200 Colo. 153, 612 P.2d 1131 (1980); *People v. Smith,* 179 Colo. 413, 500 P.2d 1177 (1972).

## A.

The trial court found that the defendant did not knowingly, intelligently and voluntarily waive his right against self-incrimination. Implicit in the court's written deci-

sion is a further finding that the defendant did not waive his right to counsel.[3]

The evidence was in direct conflict. The trial court found that the defendant asked the interrogating officers whether he needed an attorney. In response, the defendant was assured he did not.

■ A request for counsel need not be sophisticated or in a legally proper form. *People v. Cerezo,* 635 P.2d 197 (Colo.1981) [The defendant said, "I think I better have a lawyer." 635 P.2d at 198]; *People v. Traubert, supra* [The defendant stated, "I think I need to see an attorney." 199 Colo. at 328, 608 P.2d 342]; *People v. Richards,* 194 Colo. 83, 568 P.2d 1173 (1977) [The defendant told the investigating officer that he would "rather talk to an attorney first." 194 Colo. at 85, 568 P.2d 1173]; *People v. Harris,* 191 Colo. 234, 552 P.2d 10 (1976) [The defendant asked the interrogating detectives, "When can I get a lawyer?" 191 Colo. at 235, 552 P.2d 10]. One additional significant finding of fact was made by the trial court. The court found "it clearly appears that the defendant believed he was working for the sheriff." In light of the totality of the circumstances, including the working relationship between the investigating officers and the defendant, the defendant's question was sufficient to put the officers on notice that the defendant intended to exercise his right to counsel and his right against self-incrimination. All questioning should have ceased until the defendant was given a reasonable opportunity to talk with his attorney. The record establishes that the defendant again asked the officers if he needed a lawyer after the interrogation was concluded. At that time, the officers answered his question in the affirmative.

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476, 86 S.Ct. at 1629. *Miranda* requires that if an accused person indicates in any manner that he or she wants to remain silent or to consult with an attorney, interrogation must cease. *See Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). An ambiguous indication of an interest in having counsel requires cessation of police interrogation. *People v. Plyler,* 86 Mich.App. 272, 272 N.W.2d 623 (1978). It is for the trial judge to evaluate equivocal words or acts in the context of the relevant circumstances to determine whether they amount to an assertion of the right to remain silent or the right to counsel. *Taylor v. United States,* 380 A.2d 989 (D.C.App. 1977).

■ An appellate court is in no position to weigh conflicting testimony presented to the trial court. On review, we are bound by the trial court's findings of fact where they are supported by adequate evidence in the record. *People v. Founds,* 621 P.2d 325 (Colo.1981); *People v. Scott,* 198 Colo. 371, 600 P.2d 68 (1979); *People v. Parks,* 195 Colo. 344, 579 P.2d 76 (1978); *People v. Pineda,* 182 Colo. 385, 513 P.2d 452 (1973); *People v. Medina,* 180 Colo. 56, 501 P.2d 1332 (1972). There is adequate evidence in the record to support the trial court's finding that the People failed to prove by clear and convincing evidence that the defendant waived his right to counsel and his right against self-incrimination.

### B.

■ We next review the trial court's determination that the statement was involuntary.[4] While it is true that the trial

3. In his ruling, the judge stated:
   "The officers here neatly foreclosed the possibility of the defendant talking to an attorney by their answer to his question of his need for an attorney. The fact that the defendant did not demand an attorney does not convince this court that he was not exercis-

ing his right. *People v. Harris,* 552 P.2d 12, 191 Colo. 234."

4. The ruling on the issue of voluntariness contained in the trial court's written decision is as follows:
   "For the taped statement to be admissible, it must be voluntary. *Jackson v. Denno,* 378

judge focused exclusively on the implied promise of protection in his conclusions of law, the judge's extensive and thorough factual findings clearly indicate he assessed the totality of circumstances, including the details of the interrogation and the conduct and characteristics of the defendant, in arriving at his decision. *People v. Thorpe,* 641 P.2d 935 (Colo.1982); *People v. Parks, supra.* There is sufficient evidence in the record to support the trial court's finding that the confession was involuntary.

## II.

In their brief, the People request a decision from this court as to whether the statement may be used to impeach the defendant if he takes the stand at trial. We decline to do so. The question of whether the statement may be used for impeachment was not presented to the trial court for its decision. Therefore, the issue is not properly before us. In addition, C.A.R. 4.1 may not be used to "piggyback" issues not encompassed by the rule to obtain pre-trial appellate decisions on evidentiary issues. *People v. Lindsey,* 660 P.2d 502 (Colo. 1983); *People v. Morrison,* 196 Colo. 319, 583 P.2d 924 (1978).

## III.

The order of the district court suppressing the defendant's statement is affirmed.

U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908]. Since the statement of Glazner to the effect that this interrogation was for the defendant's protection, it was an implied promise that no harm would come to the defendant for making it and it violates the rule laid down in *Brady v. U.S.,* 397 U.S. 742 [90 S.Ct. 1463, 25 L.Ed.2d 747], which provides that the statement must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."