**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Courtney LEGLER, Defendant–Appellee.**

**No. 98SA280.**

Supreme Court of Colorado, En Banc.

Nov. 30, 1998.

A.M. Dominguez, Jr., District Attorney, 19th Judicial District, Thomas Quammen, Assistant District Attorney, Greeley, for Plaintiff–Appellant.

Linda S. Miller P.C., Linda S. Miller, George L. Blau, Fort Collins, for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal pursuant to C.A.R. 4.1, the People seek reversal of the trial court's suppression of statements made by a juvenile defendant during the course of a custodial interrogation, and suppression of evidence derived therefrom. The trial court held: (1) that the juvenile's grandmother, who was present at the interrogation, did not qualify as a "physical custodian" for purposes of section 19–2–511(1), 6 C.R.S. (1998); and (2) that the hostility between the legal interests of the juvenile and those of her grandmother rendered the grandmother incompetent to assist the juvenile in waiving her constitutional rights under section 19–2–511(1). We affirm.

## I.

On November 4, 1997, a Greeley police officer interrogated Courtney Legler, who was then sixteen years old, in connection with a robbery and murder. Also present at the custodial interrogation were Legler's grandmother, Bonnie Jennings, and her step-grandfather. At the time of the interrogation, the Boulder County Department of Social Services was Legler's legal custodian. This custodianship arose out of an August 1994 dependency and neglect determination. Following that adjudication, Legler resided in Boulder County juvenile group homes for several years. However, after Legler learned that she was pregnant in 1996, the Department of Social Services approved her grandmother as a paid foster care provider. Jennings served in this capacity from June 1996 through August 1997, during which time Legler gave birth. On August 21, 1997, Le-gler ran away from her grandmother's house, leaving her infant daughter behind. Upon locating Legler, Boulder County Social Services attempted to return her to Jennings' house; however, Jennings made it clear that Legler was not welcome to return. As a result, Legler was placed at the Broadway Youth Shelter in Boulder. After spending one week at the shelter, Legler ran away again. Legler was on the run when she was arrested in connection with the instant charge.

Prior to Legler's interrogation, Greeley police officers investigating the murder spoke with Jennings. She told them that a friend of Legler's informed her that Legler had been involved in a murder. Acting on this tip as well as on other information, the police arrested Legler in the early morning hours of November 4, 1997. Upon learning of her arrest, numerous people unsuccessfully attempted to invoke Legler's constitutional rights prior to her interrogation. The Director of the Boulder County Department of Social Services notified the police that Legler was not to be interviewed without an attorney present and, further, that Jennings did not have authority to waive any of Legler's rights. Similarly, Legler's guardian ad litem[1] sent a letter to the police via facsimile which stated that Legler was not to be interviewed without an attorney present. The police were in receipt of the guardian ad litem's letter before commencing the interrogation. Finally, a Weld County public defender, acting at the guardian ad litem's request, arrived before the interrogation began. He was denied access to Legler.[2]

Meanwhile, Mr. and Mrs. Jennings came to the police station at the request of the arresting officer. They were then taken into the interview room with Legler. The police did not give Legler an opportunity to consult with her grandmother privately be-

---

1. Section 19–1–103(59), 6 C.R.S. (1998) defines a "guardian ad litem" as follows:
   [A] person appointed by a court to act in the best interests of a person whom the person appointed is representing in proceedings under this title and who, if appointed to represent a person in a dependency and neglect proceeding under article 3 of this title, shall be an attorney-at-law licensed to practice in Colorado.

2. Section 19–2–511(1) further provides:
   [I]f a public defender or counsel representing the juvenile is present at such interrogation, such statements or admissions may be admissible in evidence even though the juvenile's parent, guardian, or legal or physical custodian was not present.

fore asking Legler to waive her constitutional rights. However, in the presence of her grandmother, Legler did state that she understood her constitutional rights.[3] In her subsequent statement to the police, Legler confessed to having played a role in the crime and revealed the location of key pieces of evidence. She was bound over for trial on first degree murder and was charged as an adult.

On May 18, 1998, the trial court granted Legler's motion to suppress her statements and any evidence derived therefrom. This appeal followed.

## II.

Section 19–2–511(1) provides:

No statements or admissions of a juvenile ... shall be admissible in evidence against such juvenile unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation and the juvenile and his or her parent, guardian, or legal or physical custodian were advised of the juvenile's [constitutional rights].

The legislature enacted section 19–2–511(1) to serve a twofold purpose. First, it codified the holding in the seminal case of *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), which extended the protections of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to juveniles. Second, the legislature created the requirement that, in order for statements made by a juvenile to be admissible, an adult must be present at the time of the interroga-

tion. The purpose of this latter requirement was to provide an "additional and necessary assurance that the juvenile's Fifth Amendment right against self-incrimination ... will be fully afforded to him." *People v. Saiz*, 620 P.2d 15, 19–20 (Colo.1980); *see also People v. Maes*, 194 Colo. 235, 237, 571 P.2d 305, 306 (1977); *People v. McAnally*, 192 Colo. 12, 15, 554 P.2d 1100, 1102–03 (1976); Catherine P. Richardson, *Confessions and the Juvenile Offender*, 11 Colo. Law. 96, 99 (1982).[4]

█  To this end, the legislature enumerated certain categories of adults who may fulfill this role of advisor for the juvenile. These categories, as set forth in the statute, are "parent, guardian, or legal or physical custodian." § 19–2–511(1). In addition, it is implicit in the legislative purpose of section 19–2–511(1) that a child involved in the commission of an offense should be afforded protective counseling concerning his or her legal rights from one whose interests are not adverse to those of the child, to the end that any statement made by the child be given voluntarily, knowingly, and intelligently. *See McAnally*, 192 Colo. at 15, 554 P.2d at 1102–03.

Therefore, the issue before us is whether Jennings' presence at the interrogation satisfied the requirements of section 19–2–511(1). Two considerations are relevant to this inquiry: first, whether Jennings in fact fit within one of the specified categories of adults authorized by the statute to advise and counsel juveniles; second, if Jennings is within one of

---

3. Legler also argues that she invoked her right to counsel prior to commencement of the interrogation. Legler relies upon a series of disparaging comments regarding public defenders that she made to the interrogating officer: (1) "I don't want a public defender. A public defender, how pathetic"; and (2) "[B]ut to try and get me for killing someone to send a public defender up here, don't you think I need a little bit more than that. A little ... a lot more."

In order to invoke the right to counsel, a person must make a recognizable "expression of a desire" for legal assistance. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). A statement sufficiently reflects a desire for counsel when it "put[s] the officers on notice that the defendant intend[s] to exercise his right to counsel and his right against self-incrimination." *People v. Fish*, 660 P.2d

505, 509 (Colo.1983) (holding that defendant's question to interrogating officer whether he needed an attorney, to which officer answered "no," sufficiently invoked right to counsel); *see also People v. Romero*, 953 P.2d 550, 554 (Colo. 1998) (holding defendant's statement, "I should talk to a lawyer," to be a successful invocation of right to counsel). As we decide this case on other grounds, we decline to address this argument.

4. The legislative purpose in enacting the statutory predecessors of section 19–2–511(1), section 19–2–102(3)(c)(I), 8B C.R.S. (1986) (repealed 1987), and section 19–2–210(1), 8B C.R.S. (1993), also applies to the present statute because the language of these statutes is substantially similar. *See People v. S.M.D.*, 864 P.2d 1103, 1106 n. 6 (Colo.1994).

the categories, whether Jennings' interests were sufficiently aligned with Legler's interests to allow Jennings to fulfill her statutory purpose.

### A.

■ The People contend that Jennings qualified as a "physical custodian" under section 19–2–511(1) of the Children's Code. We disagree.

For the purposes of section 19–2–511(1), a "physical custodian" is defined as a "guardian, whether or not appointed by court order, *with whom the juvenile has resided.*" § 19–1–103(84), 6 C.R.S. (1998) (emphasis added).

■ In support of their argument, the People rely on the fact that Legler *had resided* with Jennings for fourteen months in the two years preceding the interrogation. For the reasons articulated below, the People's argument is without merit. We hold that physical custodians under section 19–2–511(1) must be limited to the adult or adults with whom the child resided immediately prior to the arrest and custodial interrogation.

■ When called upon to interpret a statute, we must construe it in a manner which is consistent with the legislature's intent. *See Meyers v. Price,* 842 P.2d 229, 231 (Colo.1992); *Jones v. Martinez,* 799 P.2d 385, 387 (Colo.1990); *People v. Davis,* 794 P.2d 159, 180 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). Where statutory language is ambiguous, we may consider the legislative history. *See Colorado Ass'n of Pub. Employees v. Department of Highways,* 809 P.2d 988, 991–92 (Colo.1991).

In enacting section 19–2–511(1), the legislature sought to "ensure that a juvenile during police interrogation is advised and counseled concerning his or her Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel by someone whose interests are consistent with those of the child." *People v. S.M.D.,* 864 P.2d 1103, 1106 (Colo.1994). The mere fact that a child has resided with an adult at some point in the past does not guarantee the kind of protective relationship contemplated by the Children's Code.

Unlike a legal custodian, who stands *in loco parentis* to a child, *see People in Interest of P.D.,* 41 Colo.App. 109, 112, 580 P.2d 836, 837 (1978), a physical custodian is only responsible for meeting a child's physical needs. Once a juvenile leaves the residence of a physical custodian, that person is no longer responsible for the juvenile's welfare. *See, e.g.,* § 19–1–103(35), 6 C.R.S. (1998) (defining "custodian" as a "person who has been providing shelter, food, clothing, and other care for a child in the same fashion as a parent would").

As demonstrated by the facts of this case, a child may reside with many different physical custodians while under the care of a single legal custodian. Under the People's reading of section 19–1–103(84), police officers seeking to interrogate a juvenile could choose from any number of past physical custodians without regard to whether the adult selected has a present obligation to the child. Yet, the very purpose of section 19–2–511(1) is to have an adult present at the interrogation who has a protective relationship with the juvenile. *See McAnally,* 192 Colo. at 15, 554 P.2d at 1103. It would contradict the legislative purpose of this statute to interpret it so broadly as to grant a continual physical custodianship to any adult with whom a child has ever resided. Under our objective test, police officers must simply determine whether the adult present at the interrogation is the juvenile's current physical custodian. If an adult is functioning as a current physical custodian for the child at the time of the interrogation, a protective relationship sufficient to satisfy the legislative purposes presumptively exists.

Accordingly, we hold that Jennings was not a "physical custodian" for the purposes of section 19–2–511(1).

### B.

■ We also hold that Jennings' interests were objectively hostile to those of her granddaughter, such that Jennings could not have aided the juvenile in making a knowing, intelligent, and voluntary waiver of her constitutional rights. *See People in the Interest of G.L.,* 631 P.2d 1118, 1120 (Colo.1981);

*Maes,* 194 Colo. at 237, 571 P.2d at 306. The police had actual knowledge of that objective hostility. Under these circumstances, the trial court was correct in suppressing Legler's statements.

■ In order to ensure that a juvenile's waiver of her constitutional rights meets the knowing, intelligent, and voluntary standard, section 19–2–511(1) requires the presence of an adult "whose interests are consistent with those of the child." *People in the Interest of S.M.D.,* 864 P.2d at 1106; *see also Maes,* 194 Colo. at 237, 571 P.2d at 306 (holding that section 19–2–511(1) expects an adult to act "on the side" of the juvenile and to "have his best interest uppermost in mind when called upon to be with a juvenile who is in police custody for alleged criminal activity"); *McAnally,* 192 Colo. at 15, 554 P.2d at 1102 (holding that section 19–2–511(1) requires protective counseling "from one whose interests are not adverse to those of the juvenile"). If the adult appearing with the juvenile has interests hostile to those of the child, the juvenile is impermissibly deprived of the protection contemplated by the statute. *See Maes,* 194 Colo. at 237, 571 P.2d at 306.

Here, the trial court found that Jennings "had legal interests that were hostile to [those of Legler]." We agree.

A review of the record in the instant case reveals that the police had actual knowledge that Jennings' interests were hostile to those of Legler in advance of the interrogation. The first indication of Jennings' hostile interests came on November 2, 1997, when the police interviewed Legler's step-grandfather. He told the police that he and his wife did not care if Legler ever returned to their home.

Several events on the morning of the interrogation served as additional notice of the hostile relationship between Jennings and Legler. When told that Jennings was on her way to the station, Legler declared, "It's a miracle, they hate me." In response, the police officer who had arrested Legler noted, "That's what I understand." Next, the letter

that the Boulder County Department of Social Services sent to the police on the morning of the interrogation stated that Jennings did not have authority to waive any of Legler's rights.

Finally, prior to the interrogation, the police showed Jennings the guardian ad litem's facsimile demand that an attorney be present during the interrogation. Jennings disregarded the guardian ad litem's request and allowed the interview to proceed without counsel. When a representative of Boulder Social Services later asked Jennings why she allowed the police to interrogate Legler despite her knowledge that Social Services and the guardian ad litem wanted Legler to have counsel, Jennings responded, "I have to walk away from [Legler], no one can help her. [S.L.] is my number one priority right now. I want [Legler] put away so I can raise [S.L.]."[5]

The People urge that Jennings qualifies under the statute because she was merely upset with Legler due to her possible involvement in a crime. *See People v. Hayhurst,* 194 Colo. 292, 298, 571 P.2d 721, 726 (1977) (holding that a parent who was upset with his son for being arrested did not necessarily have interests adverse to those of the child). However, we find *Hayhurst* to be inapposite because the record reveals that this was not merely a case of an angry grandparent, but one where the grandparent's legal interests were objectively hostile to those of the juvenile.

As the police had actual knowledge that Jennings' legal interests were hostile to those of Legler prior to the interrogation, we hold that the trial court was correct in suppressing the custodial statements.

## C.

■ Finally, the People argue that even if Jennings fails to qualify as a "physical custodian" pursuant to section 19–2–511(1), Legler's statements were incorrectly sup-

---

5. Jennings had been serving as a foster parent for Legler's infant daughter, S.L. At the end of the interrogation, Jennings once again expressed her desire to raise Legler's child. As Jennings

and Legler were leaving the interrogation room, Jennings told Legler that she "needed to give up rights [to her child] because [she would not] be able to be a mother for a long time."

pressed because Jennings satisfies section 19–2–511(3), 6 C.R.S. (1998).

Section 19–2–511(3) allows the admission of a juvenile's statements "if the juvenile was accompanied by a responsible adult who was a custodian of the juvenile or assuming the role of a parent at the time." We find this argument to be without merit.

Section 19–1–103(35) defines a "custodian" as a "person who has been providing shelter, food, clothing, and other care for a child in the same fashion as a parent would, whether or not by order of court." The facts of this case demonstrate that Jennings had not been providing shelter, food, clothing, or care for Legler at the time of her arrest. In fact, Jennings had neither seen nor heard from Legler in over two months, and she refused to allow Legler to return to her home. As such, Jennings was not acting in the same fashion as a parent would act, as contemplated by the statute.

Accordingly, we affirm the trial court's order suppressing statements and evidence and return the case for further proceedings consistent with this opinion.

SCOTT, J., concurs.

Justice SCOTT concurring in the judgment:

I agree with the "two considerations" or test set forth by the majority for determining whether a guardian's or custodian's presence at an interrogation satisfied the requirements of section 19–2–511(1), 6 C.R.S. (1998): First, "whether [the adult] in fact fit[s] within one of the specified categories of adults authorized by the statute to advise and counsel"; and Second, if within one of the categories, "whether [the adult's] interests were sufficiently aligned with" and not objectively hostile to the juvenile's. Maj. op. at 695. I further agree that if the questioned adult meets both tests, then, the parent, guardian, or custodian has the legal ability to perform in a manner contemplated by the purposes of the Children's Code and, hence, statements of the juvenile may be admitted notwithstanding the prohibitions in section 19–2–511.

I write separately, however, to make clear two things. First, that under the first prong

of that test, I would conclude that Bonnie Jennings, Courtney Legler's grandmother, fits within the definition of "physical custodian" and should not lose that status because the juvenile, Courtney Legler, ran away from their home. Second, the "objectively hostile" standard of the majority's second consideration, *see* maj. op. at 695, fulfills the purpose of the statute as elucidated in section 19–1–102(d), 6 C.R.S. (1998) and section 19–2–102, 6 C.R.S (1998).

## I.

### A.

It is well settled that courts should give effect to the intent of the General Assembly and should not impute their own meaning to otherwise clear statutory language. *See People v. White*, 870 P.2d 424, 445 (Colo.), *cert. denied*, 513 U.S. 841, 115 S.Ct. 127, 130 L.Ed.2d 71 (1994); *People v. Schuett*, 833 P.2d 44, 47 (Colo.1992). To discern legislative intent, a court should look first to the statutory language, *see People v. Warner*, 801 P.2d 1187, 1190 (Colo.1990), and give statutory words and phrases their full effect according to their plain and ordinary meaning. *See People v. District Court*, 713 P.2d 918, 921 (Colo.1986).

It has been firmly established by this court that when interpreting statutes to meet the intent of the General Assembly, we must give meaningful effect to the whole of the statute. *See Colorado State Bd. of Medical Examiners v. Saddoris*, 825 P.2d 39, 42 (Colo.1992) (statutes must be construed as a whole to give consistent, harmonious and sensible effect to all their parts); *City of Lakewood v. Mavromatis*, 817 P.2d 90, 96 (Colo.1991) (primary goal in determining meaning of statute is to ascertain and give effect to intent of legislature); *Charlton v. Kimata*, 815 P.2d 946, 949 (Colo.1991) (if possible, supreme court must give effect to every word of statute). Thus, when interpreting the rights of juveniles before our courts under comprehensive legislation such as the Children's Code, we are obliged to give meaning to all provisions of that code in an effort to further the public policy represented by the legislative scheme. *See A.B. Hirschfeld Press, Inc. v.*

*Denver,* 806 P.2d 917, 920 (Colo.1991). If statutes elsewhere in our laws touch upon the same subject but are potentially conflicting, courts should reconcile the statutes, if possible, to ensure a consistent and sensible application of the law. *See In re Estate of David v. Snelson,* 776 P.2d 813, 818 (Colo. 1989).

By giving deferential effect to comprehensive statutes adopted by our General Assembly, courts recognize that legislators, not judges, are uniquely authorized to choose between alternatives of general application and, as a consequence, determine matters of public policy. This is true with regard to rights and procedures as to the use of statements of juveniles in proceedings before our courts. Hence, we should recognize a holistic approach, beyond criminal law or solely penal considerations, for the admission of statements of juveniles in order to effect the legislative purpose of assuring the development of our children, including their discipline as well as their care and protection.

In setting forth its legislative intent under the Children's Code at sections 19–1–102 and 19–2–102, 6 C.R.S. (1998), the General Assembly evinced its desire regarding the treatment of children:

**Legislative declaration.** (1) The general assembly declares that the purposes of this title are:

(a) To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society;

(b) To preserve and strengthen family ties whenever possible, including improvement of home environment;

(c) To remove a child from the custody of his parents only when his welfare and safety or the protection of the public would otherwise be endangered and, in either instance, for the courts to proceed with all possible speed to a legal determination that will serve the best interests of the child; and

(d) to secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society.

§ 19–1–102, 6 C.R.S. (1998).

**Legislative declaration.** The general assembly hereby finds that the intent of this article is to protect and improve the public safety by creating a system of juvenile justice that will appropriately sanction juveniles who violate the law. The general assembly further finds that, while holding paramount the public safety, the juvenile justice system shall take into consideration the best interests of the juvenile in providing appropriate treatment to reduce the rate of recidivism in the juvenile justice system and to assist the juvenile in becoming a productive member of society.

§ 19–2–102, 6 C.R.S. (1998).

### B.

Section 19–1–103(84), 6 C.R.S. (1998) states that "physical custodian," as used in section 19–2–511, "means a guardian, whether or not appointed by court order, with whom the juvenile has resided."

It is undisputed that Legler lived with Jennings for fourteen months prior to the questioned interrogation and was to have continued living there but for her departure from the home of her custodian as a runaway only weeks before the police interrogation. Thus, based on the plain language defining "physical custodian," I would conclude that Jennings satisfies the statutory definition.

Like the majority, I view the language as plain, straightforward and not ambiguous. *See* maj. op. at 695. Unlike the majority, however, in my view the statute's language "with whom the juvenile has *resided* " indicates that a physical custodian is not "limited to the adult or adults with whom the child resided *immediately prior to the arrest and custodial interrogation." Id.* (emphasis added). In defining "physical custodian" in that manner, the majority reads into the plain language of the statute additional words and therefore alters the intent of the General Assembly. In enacting section 19–1–103(84), the General Assembly was free to define "physical custodian" as the majority does today by using the limiting language it has

imported into the definition, or perhaps more clearly, by stating that a physical custodian is one "with whom the juvenile resides." The General Assembly, however, did not so define "physical custodian," but instead chose the broader language "with whom the juvenile has resided," which, by its grammatical tense, indicates a person with the lawful ability to exercise custody and control over the child and a person with whom the child has ever resided.

The majority, on the other hand, interprets the definition narrowly as to what is, or may be, contrary to a child's penal interests without taking into account all of the interests and objects represented by our Children's Code. *See* § 19–1–102, 6 C.R.S. (1998). I read the statute more broadly so as to effect the General Assembly's attempt to ensure that the juvenile has the benefit of physical custodians pursuant to section 19–2–511, including an adult whose home the child may have run away from recently. In effect, if taken to its natural result, the majority would exclude adults based on the fact that the child ran away from home—a person no longer described as one "with whom the juvenile resides."

However, the majority opinion should not be read as suggesting in all cases that an adult is not a "physical custodian" where the child is not living at the home of the adult at the time of the interrogation. *See* maj. op. at 695 ("It would contradict the legislative purpose of this statute to interpret it so broadly as to grant a continual physical custodianship to any adult with whom a child has ever resided."). Section 19–1–103(35), 6 C.R.S. (1998) defines "custodian" as a "person who has been providing shelter, food, clothing, and *other care for a child in the same fashion as a parent would.*" (Emphasis added.) The underscored language indicates that a custodian is responsible for much more than the mere housing and feeding of a child, as this definition reaches an entire range of indefinable care rendered by parents in the course of raising a child.

Recently, we construed the term "physical custody" appearing elsewhere in our Children's Code to mean "not limited to having actual, physical control of the child ... [and

cited] *Henderson v. Henderson*, 174 Mont. 1, 568 P.2d 177 (Mont.1977) (finding the term 'physical custody' is not limited to having actual, physical possession of the child, but relates to the custodial rights involved in the care and control of the child)." *See In re Custody of C.C.R.S.*, 892 P.2d 246, 252–53 (Colo.1995). There, we held that "since the [adults] had physical possession and control" they had standing to petition for custody. *Id.* at 253. While I agree that our holding in *C.C.R.S.* addressed issues concerning the adoption of a juvenile, I find the majority's view, in this case, that a "physical custodian" set forth in section 19–2–511(1) is only a person with whom a child has resided "at the time of the interrogation," maj. op. at 695, in conflict with both the plain language and our precedent.

Accordingly, while I adopt the test announced by the majority today, in my view its application here is not consistent with the plain language of the statute and, as a consequence, does not follow the express legislative intent of our General Assembly.

II.

However, I agree with the second consideration of the majority's test, that is, whether the interests of the custodian are objectively hostile to those of the juvenile, and join in its application here.

The General Assembly declared that one of the purposes of the Children's Code is "to secure for any child removed from the custody of his parents the necessary care, guidance, and discipline to assist him in becoming a responsible and productive member of society." § 19–1–102(d), 6 C.R.S. (1998). Contrary to this purpose, Jennings' reasoning for waiving Legler's constitutional rights was not based on "care, guidance, and discipline"; instead Jennings stated that she acted without sympathy for her granddaughter, that she did not love her granddaughter, and that she wanted "Legler put away so [Jennings] can raise [Legler's baby]." This intentional conduct or motive I find wholly inconsistent with the legislative intent behind the Children's Code.

Therefore, I conclude that there is evidence in the record which supports the trial court's finding that Jennings was incompetent to assist Legler, as contemplated by the Children's Code, and thus, Legler did not waive her rights under section 19-2-511(1). Accordingly, I concur in the judgment of the majority.