PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Brandon J. BRADSHAW,
Defendant–Appellee.

No. 06SA366.

Supreme Court of Colorado,
En Banc.

April 9, 2007.

Kenneth R. Buck, District Attorney, Nineteenth Judicial District, Michael J. Rourke, Chief Deputy District Attorney, Greeley, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, State Public Defender, Jeri D. Shephard, Deputy State Public Defender, Greeley, Colorado, Attorneys for Defendant–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

The People bring this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), C.R.S. (2006), to reverse a trial court ruling suppressing statements and physical evidence obtained during the custodial interrogation of defendant, Brandon J. Bradshaw ("Bradshaw"). The trial court's ruling to suppress statements was based on its finding that the interviewing officer violated Bradshaw's *Miranda* rights by failing to cease the interrogation when Bradshaw requested an attorney. The trial court further suppressed evidence from swabs of Bradshaw's mouth as fruit of the poisonous tree.

Because the record supports the trial court's ruling that Bradshaw's statements were properly suppressed, we affirm this aspect of the trial court's order. As to the physical evidence from the buccal swabs, we find that the trial court inappropriately applied the fruit of the poisonous tree doctrine to a *Miranda* violation. Thus, with respect to the physical evidence from the buccal swabs, we reverse the trial court's order.

## I. Facts and Procedural History

On January 7, 2006, a man calling himself "Mike Wallace," met a female real estate agent ("E.P.") at her office in Weld County. After discussing various properties, the two drove separately to a home for sale outside of Keenesburg. Following a tour of the home, E.P. says the man grabbed her from behind, dragged her into the laundry room, and demanded her credit cards with personal identification numbers. When she was unable to tell him the access numbers, he took her to her car to collect her checkbook and forced her back into the home. The man then took E.P. to the master bedroom and ordered her to write out six separate checks in the amount of $1,000 each, payable to Brandon Bradshaw. She claims she was then made to undress, lay on the bed, and was sexually assaulted. E.P. told police that when the man was finished, she was allowed to drive back to her office.

E.P. immediately reported the incident to police. Later that day, she identified Brandon Bradshaw from a photographic lineup as the man who assaulted her. Two days later, Bradshaw was found in a Wheat Ridge hotel where he was arrested for a parole violation. He was booked into the Jefferson County Jail and interviewed by investigator Alan Caldwell ("Caldwell"). At the start of the interrogation, Caldwell identified himself as a detective with the Weld County Sheriff's Office. He told Bradshaw that he wanted to ask him some questions "regarding the crime of sexual assault." Caldwell then advised Bradshaw of his *Miranda* rights, including the right to have a lawyer present during questioning. Bradshaw stated that he understood these rights and that he was willing to talk to the detective. Caldwell asked Bradshaw to tell him what happened. Bradshaw told the detective that he did meet E.P. to tour the house but that after the tour they began talking about their lives and ended up having sex in the empty house. Bradshaw also told Caldwell that E.P. voluntarily wrote him three checks for $1,000 each because he needed the money.

Caldwell then told Bradshaw that E.P.'s version of the encounter differed significantly from his.

> Caldwell: So this lady is telling us that this isn't really ... how it happened. She told us you grabbed her.
>
> Bradshaw: No. I never grabbed her.
>
> Caldwell: Unless you were going, okay, let's backtrack a little bit. Tell me from beginning to end what happened exactly from the time you got there.
>
> Bradshaw: *You know, if she's, if she's got some other different story, I'm going to have to talk to an attorney about this,* because this is, this is, you know, I mean, this obviously, this is a serious thing.
>
> Caldwell: This is a serious thing.
>
> Bradshaw: You know, I mean, I don't know what class felony it is, but you know, I mean, obviously this is serious if she's saying something different.
>
> Caldwell: Okay.
>
> Bradshaw: So, you know, um.
>
> Caldwell: So, are you, are you telling me that this was consensual?
>
> Bradshaw: Yes it was.
>
> Caldwell: *And are you telling me that you want to talk to a lawyer now?*
>
> Bradshaw: *Well, yeah. I mean, you know, you're telling me she said something different and uh.*
>
> Caldwell: Okay. Well, what I need to know is whether you want to continue talking to me in here or not. Okay? If you, if you want to speak to a lawyer then I will stop my questions, okay. If you want to continue to talk to me, it needs to be voluntary on your part and you need to tell me the truth.
>
> Bradshaw: Well, I want to know what I'm facing here. I mean.

Caldwell: Well, I'm investigating a sexual assault, and I think you did it.

Bradshaw: Okay, and, and, you know, you have that right, but I mean what are we looking at, I mean?

Caldwell: It's a felony. I don't know what class felony it is.

Bradshaw: Why, I knew it was a felony. I mean, obviously [it's] a felony.

Caldwell: But, but, that's all I, I don't know on the top of my head whether it's a class three, class four felony, but it is a serious felony. So, do you want to continue talking to me here or not or do you ...?

Bradshaw: Yeah, I'll talk to you.

(Emphasis added).

The interrogation then continued for another forty-five minutes, during which Bradshaw made various incriminating statements. Toward the end of the interrogation, Caldwell asked Bradshaw to consent to a swab of his mouth for DNA. Caldwell read aloud a consent form for the search as Bradshaw silently read along. Bradshaw then verbally agreed to the search and signed the waiver. The swabs were later tested by the CBI, which determined that Bradshaw's DNA was a conclusive match to the physical evidence found at the scene.

Before trial, Bradshaw filed a motion to suppress all statements he made after his request for an attorney. In a separate motion, Bradshaw also sought to suppress all physical evidence arising from the swab of his mouth, claiming that the search was involuntary because it came during an unconstitutional interrogation.

Bradshaw argued that he unambiguously requested counsel on two occasions moments after he signed the *Miranda* waiver. Bradshaw claimed that he initially requested an attorney when he stated, "I'm going to have to talk to an attorney about this." He next requested an attorney seconds later then Caldwell asked, "Are you telling me that you want to talk to a lawyer now?" to which Bradshaw answered "Well, yeah." Bradshaw argued that these two demands for representation should have placed Caldwell on notice that Bradshaw was invoking his right to counsel. Thus, Caldwell's failure to scrupulously honor this request was a violation of Bradshaw's *Miranda* right to counsel.

Regarding the physical evidence arising from the buccal swabs, Bradshaw argued that as a consequence of the unconstitutional interrogation, he did not have access to an attorney who would have advised him not to submit to the test. Bradshaw further argued that since the physical evidence was collected during the unconstitutional interrogation, the Fourth Amendment search cannot be separated from the *Miranda* violation. This made the physical evidence from the buccal swabs fruit derived from the poisonous tree of illegal government action. Thus, Bradshaw argued that all evidence collected by the police during the interrogation must be suppressed.

Upon reviewing Bradshaw's motions, the interrogation transcript, and having heard the testimony of Detective Caldwell, the court issued a ruling from the bench finding that Bradshaw unambiguously and unequivocally requested counsel when he stated, "I'm going to have to talk to an attorney about this." The trial court ruled that Caldwell should have scrupulously honored this request by ending the interrogation and contacting the Public Defender so that counsel could be provided to Bradshaw. Thus, the trial court held that all statements made by Bradshaw after the implication of his right to counsel should be suppressed.

The court similarly suppressed the physical evidence from the buccal swabs. The court found that because Bradshaw signed the consent form allowing the physical search after he invoked his right to an attorney, the swabs should be suppressed as fruit of the poisonous tree.

Citing C.A.R. 4.1 and section 16–12–102(2), the prosecution commenced this interlocutory appeal disputing both the suppression of the statements and the physical evidence.

## II. Analysis

The issue in a suppression case is one of mixed law and fact. *People v. Arroya*, 988 P.2d 1124, 1129 (Colo.1999). While we defer to the trial court's findings of fact

"when there exists sufficient evidence in the record to support them," the court's conclusions of law are subject to our de novo review. *People v. Adkins*, 113 P.3d 788, 791 (Colo.2005).

After reviewing the court's order, the tape recording of the interrogation and accompanying transcript, we hold that the trial court correctly found that Bradshaw requested an attorney early in the interrogation. Consequently, we hold that there was a factual basis for suppressing all statements made during the interrogation after Bradshaw asserted his right to an attorney. When Bradshaw stated, "I'm going to have to talk to an attorney about this," he made an unambiguous and unequivocal request for a lawyer. The interrogation should have immediately ceased and a lawyer should have been provided to Bradshaw prior to continued questioning. Thus, we affirm the order of the trial court regarding the suppression of all interrogation statements made by Bradshaw after the request for counsel. In addition, we find no factual basis for the prosecution's claim that Bradshaw voluntarily reinitiated the interrogation. Caldwell never ceased the interrogation; hence Bradshaw could not reinitiate it.

As to whether the trial court acted within its discretion in suppressing the physical evidence from the buccal swabs, we hold that the court incorrectly applied the fruit of the poisonous tree doctrine. Consent to a physical search for DNA raises the question of voluntariness. To determine if the search was reasonable, the trial court should have examined whether Bradshaw voluntarily consented. Because the trial court did not evaluate the search to determine if it was reasonable, we reverse the order of the trial court suppressing the physical evidence from the buccal swabs.

## A. Suppression of Interrogation Statements

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and later in *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court described the scope of protection afforded those invoking their right to counsel under the Fifth Amendment to the United States Constitution. *Miranda* first identified that the Fifth Amendment requires certain procedural safeguards to ensure that a defendant is aware of his right to remain silent and consult with counsel. Specifically, *Miranda* requires officers to advise persons that they have the right to remain silent, that any statements made may be used against them, that the accused has the right to an attorney prior to and during interrogation, and that if the accused cannot afford an attorney one will be furnished without cost. *Miranda*, 384 U.S. at 486–87, 86 S.Ct. 1602. The United States Supreme Court further held that once an attorney has been requested, all interrogation must stop until such time as the accused has consulted with counsel. *Id.*

In this case, Officer Caldwell began the interrogation by asking Bradshaw a number of preliminary questions including whether he met with E.P. that day, whether he toured the house, and what he and E.P. had talked about during the tour. Caldwell then asked Bradshaw whether Bradshaw and E.P. had engaged in sexual relations at the house. Bradshaw replied that they had. As soon as Caldwell informed Bradshaw that E.P. was accusing him of sexual assault, Bradshaw's demeanor changed significantly. He exclaimed:

> You know, if she's, if she's got some other different story, I'm going to have to talk to an attorney about this, because this is, this is, you know, I mean this obviously, this is a serious thing.

We find that Bradshaw's statement, "I'm going to have to talk to an attorney about this" was an unambiguous and unequivocal demand that the interrogation end and counsel be summoned on his behalf.

Instead of scrupulously honoring Bradshaw's request that he should receive legal assistance, Caldwell continued the interrogation by asking, "So, are you, are you telling me this was consensual?" After Bradshaw confirmed that it was, Caldwell only then asked, "Are you telling me that you want to talk to a lawyer now?" Bradshaw again

made an unambiguous and unequivocal request for an attorney when he replied, "Well, yeah."

The prosecution cites three bases as to why Caldwell's failure to scrupulously honor Bradshaw's request for an attorney was not a *Miranda* violation. First, the prosecution contends that Bradshaw's requests were ambiguous, thus not rising to the standard we adopted in *Adkins,* 113 P.3d at 792–93. Second, the prosecution argues that Caldwell did not violate Bradshaw's right to counsel when he made additional inquiries to clarify Bradshaw's ambiguous request. Finally, the prosecution contends that during these efforts to clarify Bradshaw's request, Bradshaw reinitiated communications with police. We find each of the prosecution's arguments unconvincing.

First, we examine the prosecution's contention that Bradshaw failed to make an unambiguous request. The United States Supreme Court has held that a request for counsel must be unambiguous and unequivocal to be sufficient. *Davis,* 512 U.S. at 461–62, 114 S.Ct. 2350. In determining whether a request for counsel was sufficient, the trial court must consider whether the accused's statements "can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The accused's request must be sufficiently clear so "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at 461–62, 114 S.Ct. 2350. If sufficiently clear, the officer must "scrupulously honor" the accused's request. *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). We have recognized and applied the Supreme Court's finding that requests for attorneys be scrupulously honored. *People v. Gonzales,* 987 P.2d 239, 241 (Colo.1999).

Prior decisions of this court identifying what constitutes an unambiguous and unequivocal statement invoking a right to counsel are consistent with Supreme Court precedent. *Adkins,* 113 P.3d 788, 792–93 (holding as unambiguous the accused's request for an attorney where the officer was informing defendant of his right to an attorney and the accused blurted out, "Why don't I have one now?"); *People v. Kleber,* 859 P.2d 1361 (Colo.1993) (holding as unambiguous the accused's request for counsel where he told police he wanted to discuss a lie detector test with his attorney); *People v. Benjamin,* 732 P.2d 1167 (Colo.1987) (holding as unambiguous the accused's request for an attorney where he filled out an indigency form prior to interrogation); *People v. Fish,* 660 P.2d 505 (Colo.1983) (holding as unambiguous the accused's request for counsel where he was told by officers "no" when he asked, "Do I need an attorney?"). In short, we have found that the accused acts unambiguously when his or her statement puts "the officers on notice that the defendant intends to exercise his right to counsel and his right against self-incrimination." *Fish,* 660 P.2d at 509.

The prosecution maintains that Bradshaw's statement, "I'm going to have to talk to an attorney about this," was an expression of future intent and not a present request for representation. Thus, the prosecution argues that the statement must be ambiguous and equivocal. This conclusion, however, ignores the past rulings of this court finding similar requests sufficiently unambiguous. For instance, in *Traubert,* we found adequate the defendant's statement, "I think I need to see a lawyer." *People v. Traubert,* 199 Colo. 322, 608 P.2d 342, 344 (1980). Similarly, in *Cerezo,* we held that the defendant's statement, "I think I better have a lawyer," was indicative of an assertion of counsel. *People v. Cerezo,* 635 P.2d 197, 198 (Colo.1981). We find the words used by Bradshaw no less persuasive. The fact that Bradshaw's request includes the future imperative, "I'm going to have to . . . ," does not overcome the clear intent that, given E.P.'s accusation, Bradshaw wanted legal representation. In each of the examples listed above, the defendant was recently advised of his right to an attorney, the interrogation had just begun, and the defendant specifically spoke of his desire to "talk to," "see," or "have" an attorney. Thus, we view these requests as indistinguishable, in that they demonstrate a clear intent to invoke the defendant's right to rep-

resentation. In addition, we find it compelling that Bradshaw invoked his right to an attorney immediately after being informed that E.P. had accused him of sexual assault, and that this occurred a mere three minutes after Bradshaw was informed of his *Miranda* rights.

By itself, Bradshaw's first request for an attorney invoked this right to counsel. Nonetheless, Caldwell pressed on with his inquiry, saying:

> Okay. Well, what I need to know is whether you want to continue talking to me in here or not. Okay? If, you know, if you want to speak to a lawyer then I will stop my questions, okay? If you want to continue to talk to me it needs to be voluntary on your part and you need to tell me the truth.

Significantly, Bradshaw then began asking Caldwell a series of legal questions regarding the nature of the charge and the class of offense, questions that a defendant would reasonably be expected to ask his attorney. Even if Caldwell failed to grasp that Bradshaw's first two requests represented unambiguous and unequivocal demands for counsel, Bradshaw's legal questions immediately following his mention of an attorney should have provided Caldwell further notice that Bradshaw was exercising his *Miranda* right.

■ The prosecution's second argument is that even if Caldwell failed to cease the interrogation after Bradshaw's first and second requests for an attorney, Caldwell was merely attempting to clarify the defendant's ambiguous statement. Further, the prosecution contends that during this attempt to clarify, Bradshaw reinitiated communications with Caldwell, thereby opening the door to Caldwell's continued interrogation. We disagree with both contentions.

■ Because we view the prosecution's second and third arguments as necessarily linked, we consider them together. The prosecution maintains, and we agree, that there are limitations to *Miranda*. In *Edwards,* for instance, the Supreme Court found a *Miranda* limitation where the accused asks for an attorney but later initiates communications with an officer, thereby

opening the door to a new round of interrogation prior to arrival of counsel. 451 U.S. at 485, 101 S.Ct. 1880. However, interrogation may not be initiated through any action of the police. *Id.* at 484, 101 S.Ct. 1880. Once the accused has made an unequivocal request for counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880.

■ Only when an accused's statements are ambiguous may police officers assert a legitimate interest in clarifying the accused's intent. *Benjamin,* 732 P.2d at 1170–71. Police are allowed a limited inquiry for the sole purpose of determining if an attorney has been requested. *Id.* However, when an ambiguous statement is made, *Benjamin* specifies that "interrogation must cease immediately except for very limited questions designed to clarify the ambiguous statement or to clarify the accused's wishes regarding the presence of counsel." *Id.* at 1171.

Bradshaw's first request for an attorney was not ambiguous. However, even if Bradshaw's statement were ambiguous, Caldwell's first question after Bradshaw invoked his right to an attorney was, "So, are you, are you telling me that this was consensual?" This question did not seek to clarify either Bradshaw's statement or his wishes. Only after this inquiry, did Caldwell ask, "And, are you telling me that you want to talk to a lawyer now?" Bradshaw's response was unambiguous and unequivocal, "Well, yeah." The limited purpose of determining the intent of Bradshaw's request having been achieved, Caldwell should have ceased the interrogation and immediately contacted the Public Defender. Instead, over the next two minutes, Caldwell asked two times whether Bradshaw would continue the interrogation. Only when Caldwell asked for the third time, "So, [do] you want to continue talking to me? Okay?" did Bradshaw finally relent, saying, "Alright. Let's talk." The interrogation continued from there. Because Caldwell's actions were not for the limited purpose of clarifying Bradshaw's request, we find that

Caldwell violated Bradshaw's *Miranda* rights by not ceasing questioning after Bradshaw invoked his right to counsel.

■ Finally, the prosecution contends that during this attempt to clarify, Bradshaw reinitiated the interrogation by asking Caldwell what level of felony he was facing. We disagree. In *Edwards*, the United States Supreme Court carved out an exception to the *Miranda* right to end interrogation by holding that a defendant requesting counsel is not subject to further interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. 1880. However, Bradshaw could not have initiated further communication because Caldwell never stopped the interrogation. Had Caldwell scrupulously honored Bradshaw's first request for an attorney and ended the interrogation, Bradshaw's question, "What am I facing here?" may have qualified as a reinitiation. However, since Caldwell did not end the interrogation, Bradshaw did not reinitiate it.

### B. Suppression of Physical Evidence

■ The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution forbid the unreasonable search of a person's home or property and seizure of nontestimonial identification evidence. *People v. Harris*, 762 P.2d 651, 654 (Colo.1988). The prohibition against unreasonable searches includes evidence taken from the accused's body. In *Williams*, this court determined that, "because of the special insult to human dignity involved when police seek evidence in body apertures or bodily fluids, special rules restrict internal body searches." *People v. Williams*, 192 Colo. 249, 256, 557 P.2d 399, 406 (1976). Consequently, a physical search or seizure where no judicial oversight precedes the physical invasion is presumed unconstitutional. *People v. Winpigler*, 8 P.3d 439, 443 (Colo.1999). However, the clear and voluntary consent of the accused may overcome the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 243, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Following the lead of the Supreme Court, we have defined voluntary consent as "the product of an essentially free and unconstrained choice by its maker and not the result of circumstances where his will has been overborne and his capacity for self-determination critically impaired." *People v. Helm*, 633 P.2d 1071, 1077 (Colo.1981).

The issue presented here is whether the search of Bradshaw's mouth was voluntary. Instead of determining voluntariness, however, the trial court concluded that because the interrogation violated *Miranda*, the search was fruit of the poisonous interrogation. The court misapplied the fruit of the poisonous tree doctrine.

■ Fruit of the poisonous tree describes evidence gathered with the aid of information obtained unconstitutionally. *Oregon v. Elstad*, 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *see also Brown v. Illinois*, 422 U.S. 590, 601–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Although the fruit of the poisonous tree doctrine applies to Fourth Amendment violations, the United States Supreme Court has imported the poisonous tree doctrine into Fifth Amendment violations in the limited circumstance where coerced statements made during interrogation directly produce additional evidence. *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285. The Court differentiated between coerced statements and statements made after a *Miranda* violation. *Id.* It held that "actual coercion" means the accused has been "compelled ... to be a witness against himself" in violation of the Fifth Amendment. U.S. Const. amend. V. Conversely, a failure to adhere to *Miranda* does not rise to a Fifth Amendment violation. *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Instead, a *Miranda* violation presumes only that "the privilege against compulsory self-incrimination has not been intelligently exercised." *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285. Thus, because *Miranda* violations do not rise to actual coercion in violation of the Fifth Amendment, the fruit of the poisonous tree doctrine does not apply. *Id.* at 304, 105 S.Ct. 1285.

Because the swabs of Bradshaw's mouth were not collected in violation of the Fourth or Fifth Amendment, and instead merely fol-

lowed a *Miranda* violation, the fruit of the poisonous tree doctrine was inapplicable.

### III. Conclusion

We hold that the trial court did not abuse its authority when it found that the defendant made an unambiguous and unequivocal request for an attorney. The officer did not scrupulously honor Bradshaw's request for an attorney, terminate the interrogation, and summon counsel. Thus, we affirm this aspect of the trial court's order.

As to the physical evidence from the buccal swabs, we find that the trial court inappropriately applied the fruit of the poisonous tree analysis to a *Miranda* violation. Thus, with respect to the physical evidence, we reverse the trial court's order.

Justice COATS concurs in part and dissents in part, and Justice RICE and Justice EID join in the concurrence and the dissent.

Justice COATS, concurring in part and dissenting in part.

Professor Wigmore introduces the first edition of his famous treatise on the law of evidence with this passage:

> In the Ninth Book of the Analects of the Confucian Sage this saying is recorded: "The Master said: 'There are some persons with whom we may pursue our studies in common, yet we shall find them unable to progress to general principles. Or, if they attain to principles, we shall find them unable to accept a common understanding of them. Or, if they reach this common understanding, we find them unable to use the principles with us in their applications.'"

1 John H. Wigmore, *Evidence*, at xiii (Preface to the First Edition) (2d ed.1923).

Because I am largely in agreement with the majority's articulation of the principles of law governing the admissibility of Bradshaw's statements,[1] our differences may appear to be little more than matters of application to individual circumstances. Were they nothing more than this, having an effect no broader than the unique circumstances of this case, it would hardly be worth the effort to point them out. I take a moment here, however, because I fear our differences may in fact reflect our lack of any common understanding of the principles governing the use of confessions. Rather than an isolated example of misapplication, the majority's application in this case seems to me to be typical of what I have previously characterized as its hostility or antipathy toward the use of confessions as a tool to solve crimes. *See People v. Adkins*, 113 P.3d 788, 796 (Colo.2005) (Coats, J., dissenting); *see also People v. Wood*, 135 P.3d 744, 754 (Colo.2006) (Coats, J., dissenting); *People v. Minjarez*, 81 P.3d 348, 358–59 (Colo.2003) (Coats, J., dissenting).

Far from being unambiguous, the defendant's "request" for counsel in this instance was a classic example of an equivocal request, expressly conditioned on the strength of the evidence against him, already in the possession of the police. Syntactically, it was even posed in the form of a conditional sentence, the protasis of which specified the condition ("if she's got some other different story") required to trigger the apodosis (then "I'm going to have to talk to an attorney about this"). It was tantamount to saying, "If what I'm telling you contradicts what you have already heard, I'm going to have to talk to an attorney." Apparently unlike the majority, I do not consider a conditional request of this kind to be an unambiguous request, and I would most certainly not require the officer to disclose or confirm for the suspect

1. I do take exception to the majority's conflation of the "scrupulously honored" test, for measuring compliance with a request to remain silent, *see Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and the *Edwards* bright-line rule, which is a *per se* rule proscribing any further interrogation of a person held in custody who has unambiguously invoked his right to counsel, *see Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); however, I consider the majority's perpetuation of this usage, *see, e.g., People v. Gonzales*, 987 P.2d 239, 241 (Colo.1999), the result of a mere lack of precision in analysis rather than an attempt to water down the "unambiguous request" essential to any invocation of the bright-line rule. *See generally* 2 W. La Fave, *Criminal Procedure* § 6.9(f) (2d ed.1999).

what he has learned from the victim or other witnesses.

The officer's follow-up questions, which the majority finds fatal, were clearly not directed at discovering more information about the alleged crime but only at clarifying the defendant's position concerning further discussion. Although even this precaution was unnecessary in the absence of an initial unambiguous request, as noted by the United States Supreme Court in *Davis v. United States*, it demonstrated a responsible attempt by the officer not to proceed against the defendant's wishes. 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In no sense could these follow-up questions be mistaken for badgering the suspect or attempting to trick him into continuing to talk without a lawyer. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

As I have noted elsewhere, *see, e.g., Adkins*, 113 P.3d at 796 (Coats, J., dissenting); *Minjarez*, 81 P.3d at 359 (Coats, J., dissenting), in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court squarely rejected the notion that confessions are in some way undesirable or unworthy evidence. It merely sought to protect suspects in the inherently coercive atmosphere of the stationhouse interrogation by requiring express notification of their rights to silence and the assistance of counsel. Because I believe the majority's open hostility to the use of confessions as a legitimate investigative tool strikes an improper balance between protecting the constitutional rights of defendants and the state's interest in protecting future victims of crime, I respectfully dissent from that portion of its opinion affirming the suppression of Bradshaw's statement.

I concur, however, in its judgment reversing the trial court's suppression of physical evidence.

I am authorized to state that Justice RICE and Justice EID join in this concurrence and dissent.