The PEOPLE of the State of Colorado, Plaintiff–Appellant

v.

Sebet REDGEBOL, Defendant–Appellee.

No. 07SA112.

Supreme Court of Colorado, En Banc.

May 27, 2008.

Carol Chambers, District Attorney, Eighteenth Judicial District, Melissa Drazen–Smith, Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Colorado State Public Defender, Tina Fang, Deputy State Public Defender, Englewood, Colorado, Attorneys for Defendant–Appellee.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

This is an interlocutory appeal from the trial court, pursuant to C.A.R. 4.1 and section 16–12–102(2), C.R.S. (2007). The People challenge the trial court's order suppressing statements made by the defendant Sebet Redgebol during a custodial interrogation. The trial court suppressed the statements because Redgebol, a recent Sudanese refugee to the United States, did not knowingly and intelligently waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and because the investigating officer did not properly honor Redgebol's request for a lawyer.

We now affirm the trial court's order. We hold that because of the inadequate translation of the *Miranda* advisement, the substantial miscommunication between the defendant and the officer, and the defendant's cultural background and limited intellectual functioning, he did not knowingly and intelligently waive his *Miranda* rights and agree to speak to the officer without a lawyer present. In addition, we find that after the defendant unambiguously requested a lawyer, the officer did not honor the request by ending the questioning and leaving the room.

## II. Facts and Procedural History

Redgebol is charged with sexual assault on a child by one in a position of trust. The victim was fifteen years old when the alleged assault occurred. A member of the Dinka tribe, Redgebol grew up in a small village in southern Sudan. He came to the United States as a United Nations refugee,[1] and had been living in this country, specifically the Denver metropolitan area, for six months when he was arrested. Since arriving here, Redgebol and his family lived in the house of the victim and her family. Redgebol, who has never attended school, speaks the Dinka language and only has a limited understanding of English gained from watching daytime television.

After Redgebol was arrested, he was transported to the Arapahoe County jail so he could be interviewed by Detective Todd Frederickson of the Aurora Police Department. However, Detective Frederickson had to first find a Dinka interpreter. This proved difficult; indeed, Detective Frederickson testified at the suppression hearing that he was "not able to find anyone who had even heard of the Dinka language." Eventually, after Redgebol had been in jail for a day and a half, Detective Frederickson did locate a Dinka translator, Helen Abyei.

Abyei was also a native of Sudan. Her native tribal language was Ngogo, but she also spoke Dinka, Arabic, and English. At the time of Redgebol's questioning, Abyei had been translating for Sudanese refugees for six years: two years in Egypt and four years in the United States. Since coming to the United States, Abyei had worked as a hospital translator, a job for which she received training and was certified. Abyei had not been trained to interpret criminal law terminology or concepts, and testified at the suppression hearing that she had not translated for the police prior to the questioning of Redgebol. Abyei had also never translated formal court proceedings, nor was she certified to interpret such a proceeding.

Because all of the jail's interview rooms were occupied, Detective Frederickson conducted the interview in the sheriff's paperwork room, where there was no video recording equipment. As a result, the only record of the interrogation is an audio recording, for which no official transcript exists.

At the beginning of the audio recording, before Frederickson has even introduced himself, Redgebol can be heard speaking. When the detective asked Abyei what Redgebol was saying, Abyei replied, "He's asking if

1. Southern Sudan has been wracked by a dec- ades-long civil war.

you are an advocate or something. I don't know what it is."

Detective Frederickson first attempted to explain to Redgebol his right to remain silent:

Frederickson: Okay. First, you have the right to remain silent. Do you understand that?

Redgebol:[2] He say, "Why should I remain silent?" He say, "Why should I keep quiet? I have the right to tell my—to tell the truth."

Frederickson: Yes, sir, you have the right to tell the truth. But you also have the right to not tell me anything if you want.

Redgebol: He say, "I will never keep quiet. I have been looking for somebody so that I talk to you for like two days ago, but I found nobody, so since you came [Frederickson started interrupting at this point and speaking over Abyei] I would like to talk to you."

Frederickson: Okay, I just want you to be fully aware that you don't have to talk to me today if you don't want to.

Redgebol then stated that he did want to talk to the detective. In response, Detective Frederickson asked Redgebol to initial the corresponding place on the *Miranda* advisement acknowledging that he understood his right to remain silent and was willing to waive it. Redgebol wrote his full first name.

Detective Frederickson next tried to explain to Redgebol that anything he said could and would be used against him in court. After Frederickson said this, Abyei, for the first time on the audio recording, pauses for several seconds and then says "Ah ..." before beginning to translate the *Miranda* right.

Redgebol's subsequent responses were confusing. He first stated, "After I tell the truth, even if it's used against me, then I make sure that I tell the truth." When Frederickson again cautioned Redgebol about self-incrimination, Redgebol asked, "Is it better that I keep quiet, because I want to tell the truth?" As the conversation contin-

ued, Redgebol soon agreed to speak even if his statements could be used against him, explaining, "I want to talk. Even if I go to jail, I prefer to talk." Redgebol then signed the form indicating he understood that right.

Detective Frederickson proceeded to explain briefly Redgebol's right to have a lawyer present during questioning. Stating that it was not a problem and that he understood, Redgebol again signed the *Miranda* advisement. The detective then tried to explain to Redgebol his right to have a lawyer appointed if he could not afford one, during which time it became clear that Redgebol did not understand the role of a lawyer:

Frederickson: If you cannot afford to hire a lawyer [translation], one will be appointed to represent you before questioning if you wish. [translation]

Redgebol: He's asking whether ... will he be the one to pay for that lawyer?

Frederickson: No, sir.

Redgebol: He say, "Yes, it's okay, that advocate can come and question ..."

Frederickson: [interrupting] He said what?

Redgebol: The lawyer can come and question him.

Frederickson: No, no, sir, it's me asking questions, not the lawyer [translation]. Do you understand what a lawyer is, Sebet?

Redgebol: Yes, he says he know, "I know who the lawyer is, it's somebody who is my defense."

Frederickson: Correct, it's someone who can protect you and makes sure you understand [translation], makes sure you understand all your rights and what you are saying in response to my questions [translation]. Okay, do you understand, Sebet?

Redgebol: Yes, I understand.

Frederickson: Do you want a lawyer to be with you today?

Redgebol: Anytime he comes.

Frederickson: It's a yes or no question, Sebet.

2. References to "Redgebol" in excerpts from the transcript indicate that Abyei was translating Redgebol's statements into English.

**Redgebol:** He is asking, "Is the lawyer coming here, or in the court?"

**Frederickson:** There's no lawyer right now, but if you want a lawyer, we can get one for you if you want one.

**Redgebol:** He's saying that "If the lawyer can come now, maybe the lawyer can bail me so that I go home because my children are now starving, they are in the same house where the problem is."

**Frederickson:** Okay, the function of a lawyer is not to pay to get you out of jail. [translation] That's the responsibility of either yourself, or a family member, or a friend, to provide that money. [translation]

**Redgebol:** So he's saying, "I'm here, far away, I don't know how to get to my parents or to talk to them."

After Detective Frederickson stated that the conversation was getting off-topic, the officer asked Redgebol directly, "Would you like a lawyer with you, while we talk today, or no?" Redgebol responded, "Yes, he would like a lawyer." The following exchange then occurred:

**Frederickson:** He would like a lawyer? Okay. [13:44. Frederickson begins to speak again at 13:48] Then I will stop. I forgot to say what time it was when we started this. We began this tape around 5:10 pm on June 23, 2004, and Sebet has just indicated that he would like a lawyer before any questioning. [14:05]

**Redgebol:** [14:25. Abyei begins to translate Redgebol's statement] He said I don't understand. Will you be questioning me, then after you go, the lawyer comes? Or will both of you be here, you and the lawyer?

After Frederickson reiterated that the lawyer was not here, but "I will question you later, once a lawyer has been appointed for you," Redgebol stated that Frederickson could talk to him now without the lawyer. Pressed for an explanation for his change of mind, Abyei translated, "[H]e thought that you would be talking with him, you would question him, after you are done, then the lawyer will start also, this is what he understood."

Frederickson, without offering any further explanation, then asked again if Redgebol fully understood that he did not have to talk to Frederickson without the presence of a lawyer. Redgebol agreed, and stated that Frederickson could speak to him because "since there is no lawyer now, you can question him, then any time the lawyer comes, then he will be ready also for the lawyer." Frederickson informed Redgebol that a lawyer would not come automatically, and Redgebol must request one. Redgebol's response became more confused, asking how a lawyer would know to come when he was in jail. When Frederickson explained that these were his constitutional rights, Redgebol instead complained about being beaten by two people before again giving Frederickson permission to question him without a lawyer present.

When Frederickson attempted to confirm Redgebol's waiver of his right to have an attorney appointed, Redgebol again exhibited his confusion: "He said 'I don't understand. If I don't have money to pay for the lawyer, should I be waiting until I request a lawyer and the lawyer comes, then you start questioning me, or because see, . . . I don't understand this.'" Frederickson then said that the state of Colorado would pay for a lawyer if Redgebol requested one. Redgebol's response was again off-topic, complaining that the person who had brought him to the United States—the victim's stepfather—was now destroying Redgebol's life and that this person had not gotten a job from Redgebol. Frederickson then steered the conversation again back to the waiver, and Redgebol soon agreed, by now over twenty minutes into the audio recording, to waive his *Miranda* rights and speak to Detective Frederickson without a lawyer present. During the two-hour questioning that followed, Redgebol made several incriminating statements regarding sexual contact with the victim.

After being charged with sexual assault on a child, Redgebol moved to suppress the statements that he made to Detective Frederickson during the interrogation, arguing that his waiver of his *Miranda* rights was

ineffective because it was not voluntary,[3] knowing, and intelligent. Redgebol contended that the many serious problems with the translation, which combined with his background, lack of education, low intellectual functioning, and the differences between the Dinka and American criminal justice systems, prevented him from knowingly and intelligently waiving his rights. Redgebol further asserted that he had unambiguously requested counsel, but that Detective Frederickson had not honored his invocation of his right to counsel.

The trial court then conducted a series of suppression hearings over the course of several months. Detective Frederickson testified that Redgebol and Abyei understood each other, and that Redgebol seemed to comprehend what was happening during the majority of the interview. Frederickson asserted that he made it "more than clear many, many, many times that Sebet did not have to talk to me if he didn't want to." Frederickson acknowledged that Redgebol had seemed a little confused about the right to counsel, but contended that this confusion had been cleared up before Redgebol waived his rights. Frederickson also testified that Redgebol invoked his right to counsel, and Frederickson stopped the questioning, but that Redgebol then reinitiated the questioning and agreed to continue speaking to Frederickson without a lawyer.

During her testimony, although acknowledging her lack of experience conducting translations for police, Abyei stated that Redgebol understood what she was explaining to him during the interview and what it meant to waive his *Miranda* rights. She testified that she told Redgebol to tell her if he did not understand something, and that Redgebol had alerted her and asked appropriate questions when he was confused. Abyei also admitted that she put her hand up several times to stop Redgebol from talking, although she did not state when that happened during the questioning. There was nothing in the audio recording indicating when Abyei raised her hand.

Abyei testified that Redgebol seemed confused about the process for obtaining a lawyer. Moreover, she herself appeared confused about the right of a person undergoing a custodial interrogation to be represented by an attorney. When asked during the suppression hearing whether Redgebol understood his right to have a lawyer present during questioning, Abyei replied by inquiring, "That day, a lawyer that very day?" and "Outside of court anytime, or that very day?"

Abyei also testified that English words do not always translate literally into Dinka, and that when she encountered this situation, she would explain the concept by putting it in a sentence, giving an example, or using Arabic words instead. For example, Abyei testified that she told Redgebol that he had a right to "bring" a lawyer, rather than the right to be represented by one, and that if he could not afford a lawyer, one would be "found" for him, rather than provided for him. Abyei stated that she used Arabic words to explain concepts because Redgebol spoke to her in Arabic and he seemed to understand it. She maintained that it was normal for people in southern Sudan to intersperse the tribal languages with Arabic. Abyei also acknowledged that she did not attempt to explain to Redgebol the differences between the Dinka and American legal systems.

Lastly, Abyei testified about the Dinka legal system. In the Dinka system, disputes are handled by the tribe's chief and elders, often while sitting under a tree. The parties to the dispute do not have the right to remain silent, but rather the right to tell the truth; that is, they are compelled to tell the elders what happened. Abyei stated that there are only cultural laws, not written ones. There are no lawyers in the system, but one's family and friends can come and defend one or speak as a witness. Indeed, the Dinka system functions as a dispute between the families, not the individuals involved. Abyei testified that prisons do exist in Sudan, but the usual punishment handed down by the elders requires the losing party's family to

**3.** Redgebol argued in the suppression hearing that his waiver was not voluntary because it was the product of improper police coercion. The trial court rejected this argument, and it is not before this court on appeal.

give cows to the victorious party's family as compensation.

Redgebol's brother, Gabriel Rieang, also testified. Rieang stated that he and his brother grew up in a small village in southern Sudan with no electricity, newspaper, school, television, or English classes. Instead, the village's residents herded cows and goats. Rieang testified that, to his knowledge, Redgebol had never attended school in his life, nor had he taken a class on the English language or the United States' justice system.

Rieang acknowledged that at least Arabic slang is commonly used in southern Sudan. However, in contrast to Abyei's testimony, Rieang testified that he did not believe Redgebol understood Arabic. He explained that when the brothers were living in Khartoum, Sudan's capital, they had seen a televised report during which there was an announcement in Arabic that the Sudanese government was conscripting young males into the army. Rieang stated that Redgebol could only understand the announcement after Rieang explained to his brother in Dinka what had been said. Rieang also contended that his brother "doesn't know that much" and was "not as savvy" as Rieang.

After hearing all of the testimony and listening to the audio recordings, the trial court made an oral ruling granting Redgebol's motion to suppress his statements. In ruling that Redgebol did not knowingly and intelligently waive his rights and that Detective Frederickson did not scrupulously honor Redgebol's request for an attorney, the trial court made significant factual findings.

It found that Redgebol was a refugee from Sudan and a member of the Dinka tribe who had lived in the United States for six months before the interrogation occurred. It determined that Redgebol had limited, if any, English language skills, and those skills were mostly learned from watching daytime television after his arrival in this country. The trial court found that he had limited intellectual abilities, but acknowledged both that Redgebol had said that he understood his rights and that his mental capacity was not so diminished as to render him unable to perceive the situation. The trial court concluded that some of Redgebol's answers were responsive to Detective Frederickson's questions, but other responses were "nonsensical and not directly responsive" to the questions asked by the officer.

Moreover, the trial court determined that Abyei did not understand the *Miranda* rights and, as a result, she did not adequately translate those rights to Redgebol. The court stated: "I believe that [because of] the interpreter's lack of understanding of the rights being afforded pursuant to *Arizona v. Miranda* [sic], they were not adequately translated to Mr. Redgebol." In addition, the court found that when Redgebol answered, "Yes, [I] would like a lawyer," in response to Detective Frederickson, the detective should have stopped the interrogation and left the room at the time of that request. Therefore, the trial court concluded, Redgebol's statements should be suppressed.

The People now appeal the trial court's order to this court.

### III. Analysis

The People argue that Redgebol's statements should not be suppressed because he knowingly and intelligently waived his *Miranda* rights and agreed to speak with Detective Frederickson. They also contend that either he did not unambiguously request an attorney or, alternatively, he immediately reinitiated the conversation with Detective Frederickson after invoking his right to counsel.

We reject the People's arguments and affirm the court's order. We hold that, accepting the trial court's finding of facts which are well supported by the record, Redgebol did not make a knowing and intelligent waiver of his *Miranda* rights because of the combined effects of the translator's inadequate translation, the substantial miscommunication between the parties, and Redgebol's cultural background and limited intellectual functioning. This conclusion accords with the reasoning in our previous decisions of *People v. Mejia–Mendoza*, 965 P.2d 777 (Colo.1998), *People v. Aguilar–Ramos*, 86 P.3d 397 (Colo. 2004), *People v. Jiminez*, 863 P.2d 981 (Colo. 1993), and *People v. Al–Yousif*, 49 P.3d 1165

(Colo.2002). In addition, not only did Redgebol not knowingly and intelligently waive his rights, but his statements must also be suppressed because Detective Frederickson failed to scrupulously honor Redgebol's unambiguous request for an attorney by continuing to question Redgebol instead of terminating the interrogation and leaving the room.

We begin our analysis by first reviewing the constitutional framework for analyzing a defendant's waiver of his or her *Miranda* rights. Next, we consider our prior case law on voluntary and intelligent waivers and apply it to the facts of this case. Finally, we evaluate Redgebol's unambiguous invocation of his right to counsel and our case law regarding what constitutes reinitiation of the questioning by a defendant and termination of the interrogation by the officer.

## A. Redgebol's Waiver of His *Miranda* Rights Was Not Knowing and Intelligent

### 1. Constitutional Framework

It is well settled that prior to a custodial interrogation, an accused must be advised of his or her rights under the Fifth and Fourteenth Amendments. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602; *Aguilar–Ramos*, 86 P.3d at 400. The officers must inform the accused that he or she has the right to remain silent; that if the accused waives this right, anything he or she says may be used against him or her; that he or she has a right to have an attorney present; and that an attorney will be appointed if the accused cannot afford one. *Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602; *Aguilar–Ramos*, 86 P.3d at 400.

Where a defendant challenges the use of his or her statements on the basis that the police obtained the statement in violation of *Miranda*, the prosecution bears the burden of proving by a preponderance of the evidence that the suspect waived his or her *Miranda* rights voluntarily, knowingly, and intelligently. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Mejia–Mendoza*, 965 P.2d at 780. If the accused makes a statement during a custodial interrogation without first being advised of and subsequently waiving his or her *Miranda* rights, then the evidence is inadmissible in the prosecution's case-in-chief. *People v. Wood*, 135 P.3d 744, 749 (Colo. 2006).

Here, the parties agree that Redgebol's questioning constituted a custodial interrogation. In addition, the trial court found, and Redgebol does not dispute, that his statements were made voluntarily. Accordingly, we focus our analysis on whether his waiver was knowing and intelligent.

The United States Supreme Court has long held that in order for a *Miranda* waiver to be intelligent and voluntary, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see Mejia–Mendoza*, 965 P.2d at 780. A court must consider "the totality of the circumstances surrounding the interrogation" to ensure that the accused evinced "the requisite level of comprehension." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. The totality of the circumstances analysis includes any language or comprehension barriers encountered by the defendant during the advisement and interrogation. *See Mejia–Mendoza*, 965 P.2d at 780; *People v. May*, 859 P.2d 879, 882 (Colo.1993).

### 2. Review of Findings of Fact

As a reviewing court, we will not overturn a trial court's findings of historical fact provided they are supported by competent evidence in the record. *See Aguilar–Ramos*, 86 P.3d at 400. Rather, we have consistently found that when supported by competent evidence, the trial court's findings of fact are binding on this court. *See, e.g., Jiminez*, 863 P.2d at 985 (collecting cases). This is because "[a]ppellate courts are not the appropriate forum to resolve factual discrepancies or to determine the credibility of witnesses." *Mejia–Mendoza*, 965 P.2d at 780. Therefore, we only review de novo the ultimate determination of whether a defendant validly waived his or her *Miranda* rights, which is an application of the law to

the facts as found by the trial court. *Aguilar–Ramos*, 86 P.3d at 400–01.

In ruling that Redgebol did not knowingly and intelligently waive his rights and that Detective Frederickson did not scrupulously honor Redgebol's request for an attorney, the trial court made significant factual findings. Based on our careful review of the record, summarized in part II above, we find considerable support for the trial court's findings; therefore, they are binding on this court. The findings are confirmed in particular by the testimony of the translator Abyei at the suppression hearing, revealing that she herself did not understand the *Miranda* rights which she was entrusted with interpreting correctly for Redgebol. Further, our review of the audio recording supports the trial court's findings that Abyei failed to perform adequately as an interpreter, that there was frequent miscommunication between the parties indicated by Redgebol's nonsensical answers to the detective's questions, that Redgebol functioned at a limited intellectual level based on his background and lack of schooling, and that Redgebol made an unambiguous request for counsel which Detective Frederickson did not honor.

In sum, we defer here to the trial court's findings of fact that are well supported by evidence in the record and accept them as binding on this court.

### 3. Prior Case Law

Our prior case law also supports the trial court's conclusion that Redgebol did not knowingly and intelligently waive his *Miranda* rights. In particular, there are four relevant cases—*Mejia-Mendoza, Aguilar–Ramos, Jiminez,* and *Al–Yousif*—where the defendant's *Miranda* waiver was challenged based on the defendant's incapacity to understand the rights or based on a language barrier between the defendant and the investigating officer.

In *Mejia–Mendoza,* the translator erroneously translated the defendant's rights and incorrectly told the officer that the defendant had understood and waived his *Miranda* rights. 965 P.2d at 779. We held that as a result, the advisement failed to explain reasonably to the defendant what his rights

were as required by *Miranda,* finding that the "interpreter was untrained in translation and in assisting law enforcement in explaining *Miranda* rights to arrested persons." *Id.* at 781. We acknowledged that no translation would ever be perfect, but "a person acting as an interpreter must be sufficiently capable of accurately expressing the substance of the suspect's rights." *See id.* at 781–82.

In *Aguilar–Ramos,* the detective himself tried to translate the advisement into Spanish, but made numerous mistakes. 86 P.3d at 398–99. He told the defendant that he had the right to "carry" silent, instead of to "remain" silent. *Id.* at 399. When stating that an attorney would be appointed if the defendant could not afford one, the detective used a verb in Spanish that meant both "appoint" and "design." *Id.* The detective also failed to respond to the defendant's questions about the right to have an attorney present, and the trial court found several instances of miscommunication where the defendant "provided answers that had nothing to do with the actual questions asked." *Id.* The detective also admitted that he did not know the Spanish translation for key words in the investigation of an alleged sexual assault. *Id.*

The trial court thus found, and we upheld, that the waiver in *Aguilar–Ramos* was not knowing and intelligent, despite the defendant answering in the affirmative on several occasions that he understood the advisement as well as signing the *Miranda* waiver. *Id.* at 399–400. We concluded, "[T]hroughout the interrogation, it is evident from the disjointed nature of the questions and answers that each party frequently had no idea what the other was talking about." *Id.* at 402.

In *Jiminez,* the suspect had both language and intellectual ability issues. The suspect's first language was Kickapoo, though he spoke some Spanish and English. 863 P.2d at 982. The trial court found that the suspect functioned at the level of a six-year old, had never been to school, had a limited vocabulary even in his native Kickapoo, and was a very concrete thinker for whom concepts like rights, lawyer, judge, and jury

were difficult to understand. *Id.* The court held, and we affirmed, that the defendant's waiver was not knowing and intelligent because the defendant did not understand his rights at the time due to his lack of capacity. *Id.* at 982, 985.

Lastly, in *Al–Yousif,* we found that the defendant's waiver was knowing and intelligent. 49 P.3d at 1167. There, the defendant was from Saudi Arabia and had been living in the United States for four years studying English, such that he could communicate in English at the level of a fifth grader. *Id.* at 1167, 1171. At the time of his arrest, the defendant was attending junior college. *Id.* at 1179.

We rejected the trial court's finding in that case that the defendant's waiver was not knowing and intelligent. *Id.* at 1167. We held that a defendant's cultural background was only relevant as to whether the defendant could understand the three basic *Miranda* rights, not to whether he or she understood the strategic advantages of and constitutional basis for those rights. *Id.* at 1170. We did concede that "[a] particular defendant's length of time in the country, education, religion, background, age, and intelligence certainly bear on the depth of understanding," *id.* at 1172, but concluded that those factors had limited relevance in Al–Yousif's particular case because he understood numerous complex English terms used during the questioning. *See id.* at 1171–72.

### 4. Application

■ Here, as in our past case law, Abyei's incorrect and insufficient interpretation, the frequent miscommunication between the parties, and Redgebol's cultural background and limited intellectual functioning meant that Redgebol did not understand, and thus could not knowingly and intelligently waive, his *Miranda* rights.

### a. The Incorrect and Insufficient Interpretation

The audio recording and the testimony from the suppression hearing indicate that, as the trial court found, Abyei did not adequately translate Redgebol's *Miranda* rights to him because of her own lack of under-

standing of the meaning of the rights. Abyei's performance as a translator was also flawed because she interrupted Redgebol, improperly summarized his responses, and did not always effectively explain instructions to him.

Abyei, like Redgebol, is an immigrant from Sudan, a country with a legal system that differs greatly from our own. Although Abyei had received training in hospital translations, she testified that she had received no training in police translations, let alone in the particular specifics of *Miranda* rights. The result was that she too was unfamiliar with the American criminal justice system and the meaning of the *Miranda* advisement.

In the first exchange heard on the audio recording, Abyei said, "He's asking if you are an advocate or something? *I don't know what it is.*" (emphasis added). Abyei's statement of "I don't know what it is" appears to reflect her own confusion and lack of understanding of the situation faced by Redgebol. At this point, she was not translating something Redgebol had said; rather, the translator here was so unfamiliar with our legal system that she knew neither what a lawyer was nor how that role differed from that of a police officer.

Abyei's confusion about the *Miranda* rights persisted throughout the questioning and was exhibited later at the suppression hearing. During the audio recording, Abyei usually translated Detective Frederickson's statements promptly after he finished speaking in English. However, when Detective Frederickson stated that anything Redgebol said could and would be used against him in a court of law, Abyei paused for the first time in the questioning before translating the officer's statement. After pausing for several seconds, Abyei then said, "Ah ..." before finally beginning to translate the advisement to Redgebol. We cannot know for certain why Abyei paused before translating this statement when she translated others without hesitation, but it appears that she herself was struggling to understand the concept of self-incrimination.

At the suppression hearing, Abyei still seemed unfamiliar with the *Miranda* rights.

When Redgebol's counsel questioned Abyei about the *Miranda* right to have a lawyer provided and present during police questioning, Abyei asked in response, "That day, a lawyer that very day?" and "Outside of court anytime, or that very day?"

In addition, Abyei testified that, like the detective in *Aguilar–Ramos*, she changed certain words and concepts when she translated the *Miranda* advisement into Dinka and Arabic. For example, Redgebol was told he could "bring" a lawyer, rather than that he had a right to have a lawyer present, and that a lawyer would be "found" for him, rather than appointed, if he could not afford one. Elsewhere, Frederickson asked Redgebol to "initial" the advisement, and after hearing the translation from Abyei, Redgebol instead wrote out his full first name, implying either that Abyei did not understand this term or that she failed to explain it properly to Redgebol such that he could understand the instruction. Later, Frederickson simply asked Redgebol to sign all the rest of the lines.

The audio recording of the police questioning and testimony from the suppression hearing also indicate that Abyei, like the translator in *Mejia–Mendoza*, did not translate Redgebol's responses verbatim and often interrupted Redgebol while he was talking. Abyei testified at the suppression hearing that she raised her hand at several points to interrupt Redgebol, although with only an audio recording we cannot tell with any certainty when that occurred. However, the audio recording demonstrates that at least once Abyei was not translating all of Redgebol's statements verbatim into English:

> **Frederickson:** Okay, so you're willing to talk to me?
>
> **Redgebol:** Yes, I would like. [translation begins while Redgebol is talking and Redgebol continues to speak after Abyei completes her translation]

Based on the fact that Redgebol was still speaking during and after Abyei's translation, it is reasonable to conclude that Abyei's statement of "Yes, I would like" was not a verbatim translation of what Redgebol was saying.

Therefore, Abyei did not meet our standard from *Mejia–Mendoza* that, as a translator, she be "sufficiently capable of expressing the substance of the suspect's rights." *See* 965 P.2d at 781.

### b. The Miscommunication between the Parties

Similar to *Aguilar–Ramos*, there were several instances of miscommunication between Detective Frederickson and Redgebol. The miscommunication took two forms: interruptions by Detective Frederickson of Redgebol and Abyei, and unresponsive and nonsensical answers by Redgebol.

### i. Interruptions by Detective Frederickson

The audio recording is replete with instances of Frederickson interrupting Redgebol and Abyei. Early in the interrogation, after Frederickson stated that Redgebol was under arrest for sexual assault, the officer twice interrupted Redgebol's off-topic responses:

> **Frederickson:** Yes, okay. You've been arrested for sexual assault, Sebet.
>
> **Redgebol:** [Redgebol speaks for a long time in Dinka] He says "Yes, I'm sorry because I've been accused and I am sure that this thing ... I ... I've never done it ..."
>
> **Frederickson:** [interrupting] Okay.
>
> \* \* \*
>
> **Frederickson:** Yes, sir, and this is what I would like to get straightened out today. [Abyei translates and Redgebol starts speaking at length in Dinka]
>
> **Frederickson:** [interrupting] Wait, wait, wait. [laughs] one moment.

Later, as Frederickson continued to try without success to explain to Redgebol the right to remain silent, the officer again interrupted Redgebol's response:

> **Redgebol:** He says, "I will never keep quiet. I have been looking for somebody so that I talk to you for like two days ago, but I found nobody, so since you came [Frederickson started interrupting at this point and speaking over Abyei] I would like to talk to you."

Next, the detective cut off Redgebol's response when Redgebol became confused regarding his right against self-incrimination:

> **Frederickson:** Well, I certainly want to hear your side of the story, Sebet. [translation done here. Redgebol begins to talk to Abyei before being interrupted by Frederickson] but—but—[interrupting Redgebol] I can't force you to talk.

Frederickson again interrupted Redgebol when he replied nonsensically regarding his right to have an attorney present:

> **Redgebol:** He says, "Yes, it's okay, that advocate can come and question . . ."
>
> **Frederickson:** [interrupting] He said what?
>
> **Redgebol:** The lawyer can come and question him.
>
> **Frederickson:** No, no, sir, it's me asking questions, not the lawyer. [translation] Do you understand what a lawyer is, Sebet?

Finally, after Redgebol requested counsel, Detective Frederickson pressed Redgebol to confirm that he was in fact waiving his right to have counsel present. In doing so, Frederickson again spoke over Redgebol:

> **Frederickson:** Okay. Sebet, would you answer this question for me, please? [translation] It's not really a question, it's more of a statement. [translation] If you don't have enough money to pay for a lawyer, [Frederickson talks over Redgebol as Redgebol responds to the translation] you can get one for free if you like. [translation] Do you understand that? [translation]

Thus, Frederickson repeatedly interrupted Redgebol and Abyei during the interrogation in his effort to complete the advisement. As in *Aguilar–Ramos*, the detective failed to answer Redgebol's questions or clarify Redgebol's considerable confusion regarding the *Miranda* rights.

#### ii. Redgebol's Nonresponsive and Nonsensical Answers

Besides Frederickson's repeated interruptions, the audio recording also contains numerous nonsensical statements by Redgebol, which often corresponded to instances when Abyei appeared to struggle with understanding what she was translating.

At the outset of the interrogation, Redgebol talked about the Dinka right to tell the truth while Frederickson was explaining the *Miranda* right to silence. Soon after, Redgebol's response to the advisement that anything he said could and would be used against him in a court of law—a right Abyei seemed to have difficulty both grasping and translating—was illogical: "After I tell the truth, even if it's used against me, then I make sure that I tell the truth."

Perhaps most troubling, Redgebol repeatedly gave confusing answers when Frederickson attempted to advise him of his right to a lawyer, confusion that was surely exacerbated by Abyei's own limited understanding of the role of a lawyer. Redgebol asked Frederickson who would be paying for the lawyer, and then gave his permission for the lawyer to come and question him when Frederickson was finished. Indeed, throughout this exchange, Redgebol seemed unclear as to when a lawyer would come and what the lawyer would do, alternatively believing that the lawyer would either bail him out of jail or act as a second investigator who would further question him. Redgebol did not seem to understand that he could request a lawyer—instead thinking that a lawyer would come independently at some point—and expressed confusion as to how a lawyer would know to come when he was in jail. Finally, when Frederickson stated that the state would pay for his lawyer, Redgebol's response was off-topic, as he instead complained about his relationship with the victim's family.

In sum, Frederickson's repeated interruptions and Redgebol's nonsensical responses demonstrate that the parties, as in *Aguilar–Ramos*, "frequently had no idea what the other was talking about." *See* 86 P.3d at 402.

#### c. The Defendant's Cultural Background and Limited Intellectual Ability

Finally, similar to *Jiminez* but distinguishable from *Al–Yousif*, Redgebol's cultural background and limited intellectual ability contributed, along with the other factors detailed above, to his inability to make a knowing and intelligent waiver of his rights.

While the defendant in *Jiminez* was found to function at a very low cognitive level, here, Redgebol, although oriented in time and place to his situation and surroundings, was similarly limited in his ability to understand the *Miranda* advisement as it was explained to him by Abyei and Detective Frederickson. Both defendants never went to school and were presumably functionally illiterate. Further, Redgebol, like Jiminez, appeared to struggle with complex concepts. His native language Dinka does not include the abstract ideas that form the basis of our *Miranda* rights.

The trial court heard conflicting evidence about how much Arabic Redgebol actually understood. It is likely that Redgebol understands some Arabic but it is undisputed that he has not been taught in that language, thus limiting his ability to understand complex concepts in Arabic any better than in Dinka. Redgebol's limited understanding of Arabic was confirmed by Rieang's testimony that Redgebol had not understood the announcement in Arabic on Sudanese television about the government's plan to conscript young males, a plan that presumably would have affected both brothers. Rieang explained at the suppression hearing that Redgebol could only understand the announcement after Rieang explained it to him in Dinka. Therefore, in the past, Redgebol had experienced difficulty understanding other abstract concepts when spoken in Arabic, even when the topic had a direct impact on him.

Further, our reasoning in *Al–Yousif* does not support a finding in this case of a knowing and intelligent waiver. In that case, the defendant, although communicating in English at a fifth-grade level, was enrolled in college after several years of schooling in the United States and was found to understand numerous complex English concepts. 49 P.3d at 1167, 1171, 1179. We thus found that he had sufficient educational knowledge to grasp the three *Miranda* rights, notwithstanding his cultural background. *Id.* at 1167, 1171–72.

Here, however, Redgebol's length of time in the country, education, and functioning intelligence level did bear on his depth of understanding such that he could not comprehend his three basic *Miranda* rights as explained by Abyei and Detective Frederickson. Contrary to the college-educated Al–Yousif, Redgebol has never been to school. Instead, until a very short time before the interrogation, he lived in a pastoral society with an entirely different cultural conception of legal disputes as a disagreement between families where punishment is normally meted out in the form of the party at fault giving cows to the prevailing party. This cultural background explains why throughout the attempted advisement, Redgebol asked seemingly nonsensical questions about his family and how they would know to come and defend him because that would have been the normal practice in the Dinka legal system. Redgebol's knowledge of the Dinka customs and practices further explains why he wanted to speak with the victim's family, whom Redgebol believed was the other party to this dispute, rather than the state.

His questions during the interrogation indicated that his cultural background significantly affected his ability to understand his *Miranda* rights, as we acknowledged could happen in *Al–Yousif. See id.* at 1172. In the Dinka culture, one only has a right to tell the truth. Speaking to an investigating authority is compulsory in the Dinka legal system, a concept completely contrary to our notion of the right to remain silent. The Dinka system has no lawyers, and thus, Redgebol labored under a substantial misunderstanding of a lawyer's role in the interrogation. The concept that he could ask for an attorney to represent him and that he could refuse to speak to the police would have been completely foreign to Redgebol.

In sum, the trial court was correct in following our past case law and finding that Redgebol did not knowingly and intelligently waive his *Miranda* rights. First, the interpreter Abyei did not have adequate training or experience to explain the *Miranda* rights to Redgebol. Second, Detective Frederickson did not resolve the substantial misconceptions regarding the three rights that Redgebol's nonsensical answers revealed, choosing instead to interrupt Redgebol or ignore his questions. Finally, because of his

cultural background and limited intellectual functioning, Redgebol could not understand an advisement of such abstract concepts in Arabic.

## B. The Defendant's Invocation of the Right to Counsel

We also reject the People's arguments that Redgebol's statement should not be suppressed because he either ambiguously invoked his right to counsel or, alternatively, he reinitiated the questioning after invoking his right to counsel.

 It is long settled that if a defendant makes an unambiguous and unequivocal request for counsel, the request must be scrupulously honored and no further questioning can occur until either a lawyer is provided for the accused or the accused voluntarily reinitiates the questioning. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *People v. Martinez*, 789 P.2d 420, 422 (Colo.1990). For a suspect to reinitiate a conversation, his comments must " 'evince [ ] a willingness and a desire for a generalized discussion about the investigation,' and not merely question the reasons for custody." *Martinez*, 789 P.2d at 422 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983)). A court should reach its decision on whether a suspect reinitiated the conversation based on the totality of the circumstances of the case, "including the background, experience and conduct of the accused." *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The prosecution must prove that the defendant waived his or her right to counsel by clear and convincing evidence. *Id.*

 There is no question that Redgebol's answer of "Yes, he would like a lawyer" to the question of "Would you like a lawyer with you, while we talk today, or no?" is an unambiguous and unequivocal request for counsel.[4]

 In addition, the People's argument that Detective Frederickson scrupulously honored Redgebol's invocation before Redgebol voluntarily reinitiated the questioning fails to acknowledge that the alleged reinitiation occurred within thirty seconds of Redgebol's request for counsel. The relevant time frame is reflected as follows:

**Redgebol:** Yes, he would like a lawyer. [13:42]

**Frederickson:** He would like a lawyer? Okay. [13:44. Frederickson begins to speak again at 13:48] Then I will stop. I forgot to say what time it was when we started this. We began this tape around 5:10 pm on June 23, 2004, and Sebet has just indicated that he would like a lawyer before any questioning. [14:05]

**Redgebol:** [At 14:25, Abyei begins to translate Redgebol's statement] He said, "I don't understand. Will you be questioning me, then after you go, the lawyer comes? Or will both of you be here, you and the lawyer?"

The People cite no case law from this jurisdiction or any other where a court has held that a defendant invoked his right to an attorney, thus ending the questioning, and then reinitiated questioning in less than a minute. Previously, we have found that a

---

4. *See, e.g., People v. Bradshaw*, 156 P.3d 452, 454, 457–58 (Colo.2007) (after the *Miranda* advisement: "You know, if she's, if she's got some other different story, I'm going to have to talk to an attorney about this, because this is, this is, you know, I mean, this obviously, this is a serious thing."); *People v. Wood*, 135 P.3d 744, 747, 752 (Colo.2006) (at the end of the advisement: "I definitely need a lawyer, right?"); *People v. Adkins*, 113 P.3d 788, 790, 793 (Colo.2005) (during the advisement: "Why don't I have one now?"); *People v. Romero*, 953 P.2d 550, 552, 556–57 (Colo.1998) (soon after the advisement: "Yeah. Cause I, ya know, I'm not gunna lie man, ya know, I mean I should wait, and I should talk to a lawyer and this and that and ya know because

I do want to go to trial on this."); *People v. Fish*, 660 P.2d 505, 507, 509 (Colo.1983), *abrogated on other grounds by People v. Hopkins*, 774 P.2d 849, 851–52 (Colo.1989) (during the advisement, the defendant asked if he needed an attorney); *People v. Cerezo*, 635 P.2d 197, 198–99 (Colo.1981) (ninety minutes after the advisement: "I think I better have a lawyer."); *People v. Traubert*, 199 Colo. 322, 325, 328, 608 P.2d 342, 344, 346 (1980) (after the advisement: "I think I need to see an attorney."); *People v. Richards*, 194 Colo. 83, 85–86, 568 P.2d 1173, 1174 (1977) (at the end of the advisement: "I would rather talk to an attorney first."); *People v. Harris*, 191 Colo. 234, 235–37, 552 P.2d 10, 11–12 (1976) (during the advisement: "When can I get a lawyer?").

defendant voluntarily waived his *Miranda* right when, after the defendant invoked his right to counsel, the police left and twenty minutes later—or more often, hours or even days later—the defendant reinitiated the conversation. *See People v. Rivas*, 13 P.3d 315, 317–18, 320 (Colo.2000); *People v. Gonzales*, 987 P.2d 239, 240 (Colo.1999); *Martinez*, 789 P.2d at 422; *accord Bradshaw*, 462 U.S. at 1042, 103 S.Ct. 2830.

Our recent decision in *People v. Bradshaw*, 156 P.3d 452 (Colo.2007), controls in the situation where the officer does not end the interrogation after a suspect requests counsel. In *Bradshaw*, we held that a defendant did not reinitiate the interrogation after requesting counsel, despite the defendant then asking "What am I facing here?", because the officer never stopped the interrogation. *Id.* at 459. Thus we concluded, "Had [the officer] scrupulously honored Bradshaw's first request for an attorney and ended the interrogation, Bradshaw's question, 'What am I facing here?' may have qualified as a reinitiation. However, since [the officer] did not end the interrogation, Bradshaw did not reinitiate it." *Id.*

In the case now before us, the trial court found that Redgebol requested an attorney and that Detective Frederickson should have terminated the interrogation and left the room until Redgebol could be appointed an attorney. This ruling is well supported by the record and is consistent with *Bradshaw*. It is undoubted that Redgebol unambiguously and unequivocally requested a lawyer. The trial court was also well within its discretion to determine that a thirty-second pause did not constitute the cessation of interrogation by the police and its voluntary resumption by Redgebol.

## IV. Conclusion

We hold that the defendant did not knowingly and intelligently waive his *Miranda* rights because of issues with the translation, miscommunication between the parties, and the defendant's cultural background and limited intellectual ability. We also hold that the investigating officer did not scrupulously honor the defendant's unambiguous request for an attorney by terminating the interrogation. Therefore, we affirm the trial court's order suppressing the defendant's statements made during the custodial interrogation.

Justice EID dissents, and Justice RICE and Justice COATS join in the dissent.

JUSTICE EID, dissenting.

In my view, Redgebol's waiver was knowing and intelligent because his *Miranda* rights were adequately translated to him and because he had the "necessary level of rudimentary understanding" of those rights as required by *People v. Al–Yousif*, 49 P.3d 1165, 1172 (Colo.2002). I would also conclude that after requesting a lawyer, Redgebol voluntarily initiated further communication with the detective and thereafter validly waived his right to counsel. I therefore respectfully dissent.

### I.

In *Miranda v. Arizona*, the United States Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As a result, the Court devised the now-familiar warnings that must be delivered to a suspect before any custodial interrogation ensues. However, the police are not required to give a "precise formulation" or "talismanic incantation" of the *Miranda* rights using the language set forth in that opinion. *People v. Hopkins*, 774 P.2d 849, 851 (Colo.1989) (citing *California v. Prysock*, 453 U.S. 355, 359–60, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)).

A statement is not "compelled" within the meaning of the Fifth Amendment if the suspect "voluntarily, knowingly and intelligently" waives his rights prior to being interrogated. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The trial court found that Redgebol's statements were made voluntarily. Accordingly, the question is whether Redgebol's waiver was knowing and intelligent under the

totality of the circumstances. *See, e.g., Al–Yousif,* 49 P.3d at 1168.[1] We have held that the question is "whether the defendant minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction." *Id.* at 1172; *see also id.* (concluding that the defendant had the "necessary level of rudimentary understanding" of *Miranda's* three precepts).

## A.

The majority invokes our traditional standard of review, stating that "when supported by competent evidence [in the record], the trial court's findings of fact are binding on this court." Maj. op. at 93. It further finds that the trial court in this case "made significant factual findings," to which we must defer. *Id.* at 92. But the trial court's entire ruling on the translation issue consists of the following statement: "[Because of] the interpreter's lack of understanding of the rights being afforded pursuant to *Arizona v. Miranda* [sic], [those rights] were not adequately translated to Mr. Redgebol." The court made no findings with regard to any particular translation made in error by Abyei, nor with regard to any particular *Miranda* right that was not adequately understood by Redgebol. However, the court did note at the outset of the hearing that "I think we have two very good interpreters available now. But the interpreters early on were limited, and *I think they did not do as good a job.*" (Emphasis added.)

Although the trial court made no findings to support its conclusion that Abyei's translation was inadequate, the majority apparently assumes that the court was persuaded by the argument made by defense counsel (and re-peated before us) emphasizing the fact that Abyei had no prior experience in criminal translation and no training in *Miranda.* The majority cites our decision in *People v. Mejia–Mendoza,* 965 P.2d 777 (Colo.1998), for the proposition that prior criminal translation experience and training in *Miranda* are essential. *See* maj. op. at 94. In my view, the decision establishes no such requirement.

In *Mejia–Mendoza,* we noted the fact that the "interpreter was untrained in translation and in assisting law enforcement in explaining *Miranda* rights to arrested persons." 965 P.2d at 781. We did not conclude from that fact alone, however, that the *Miranda* warnings given were inadequate. On the contrary, we found that the interpreter's lack of training led to specific instances of serious and significant mistranslations. For example, we noted that:

> Rather than directly translating the *Miranda* advisement, the interpreter provided misleading and confusing statements to Mejia–Mendoza regarding his waiver and privilege against self-incrimination. The interpreter told Mejia–Mendoza that "[n]othing is being used against you" and "[j]ust because you say something you'll be released."

*Id.* In other words, the interpreter in *Mejia–Mendoza* made two blatantly misleading statements to the defendant: that whatever he said would *not* be used against him (when it would), and that he would be released if he talked (perhaps inducing him to talk with an untrue promise of release). *Id.*

Moreover, the interpreter in that case exceeded his role as translator, and instead became an active participant in negotiations between the police and the defendant. We noted that "the interpreter not only mis-

---

1. In assessing the validity of a waiver, a court may consider a number of non-exclusive factors, including: (1) the time interval between the initial *Miranda* advisement and any subsequent interrogation; (2) the extent to which a suspect has been informed or is aware of the subject matter of the interrogation prior to its commencement (although it is not incumbent upon officers to inform the suspect of the investigation's subject matter, *see Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)); (3) whether the accused or the interrogating officer initiated the interview; (4) whether and to what extent the interrogating officer reminded the suspect of his rights prior to the interrogation by asking him if he recalled his rights, understood them, or wanted an attorney; (5) the clarity and form of the suspect's acknowledgement and waiver, if any; (6) the accused's background and experience in connection with the criminal justice system; and (7) the suspect's language comprehension, age, experience, education, background, and intelligence. *See, e.g., People v. Humphrey,* 132 P.3d 352, 356 (Colo.2006).

translated the *Miranda* advisement but also volunteered statements, both to Mejia–Mendoza and on his behalf to the detective, that were inaccurate." *Id.* For example, the interpreter "improperly told the detective that Mejia–Mendoza had waived his rights when he had said nothing." *Id.* at 782.

In sum, we concluded that the *Miranda* rights were not adequately conveyed to the defendant in *Mejia–Mendoza* because the interpreter in that case made significant mistranslations and improperly involved himself in negotiations. The fact that the interpreter was "uneducated and inexperienced" may have led to these translation problems, *id.* at 781, but did not in and of itself invalidate the defendant's *Miranda* waiver. Under a proper understanding of *Mejia–Mendoza*, the fact that Abyei lacked *Miranda* training and criminal experience did not make her translation inadequate per se. Rather, the question is whether Abyei was able "to understand and properly convey the *Miranda* advisement" to Redgebol. *Id.*

As to this question, I would conclude that the trial court applied too high of a standard in determining whether Abyei was able to understand and convey the *Miranda* advisement. For instance, the court started the hearing by commending the interpreters who were interpreting the hearing at the time, and stating that "earlier interpreters"—presumably including Abyei—"did not do as good a job." In *Mejia–Mendoza*, however, we expressly stated that interpreters of police interrogations did not have to meet the same "exacting standards" that govern in-court interpreters. 965 P.2d at 781. Indeed, we acknowledged that the "exigencies of the moment often dictate that authorities settle for less outside of the court than is required in court." *Id.* In this case, such an exigency existed: Redgebol needed an interpreter who spoke Dinka, a language that is not commonly spoken by interpreters in Colorado; he

had been in custody for a considerable amount of time while the police were attempting to locate a Dinka interpreter; and he had become concerned about the welfare of his children while he was being held. The fact that Abyei may not have been qualified as an in-court interpreter is not determinative here; again, the question is whether her skills were adequate to translate the *Miranda* advisement to Redgebol.

From a review of the record, they were. Abyei was a certified interpreter. She fluently spoke Redgebol's native language, Dinka, and had been interpreting in that language for several years. She had translated for refugees during the asylum process in Egypt and had been trained in hospital interpretation as well. Abyei testified that although she did not know what the term "*Miranda*" meant, she did understand what an "interrogation" was. Contrary to the majority's suggestion that Abyei "did not understand the *Miranda* rights," maj. op. at 94, at no point did Abyei testify that she did not understand the rights that she was required to translate to Redgebol.

More importantly, Abyei's translation of the *Miranda* advisement was accurate, and was not riddled with the misleading and confusing statements exhibited by the interpreter in *Mejia–Mendoza*. Abyei testified that during Redgebol's interview, she literally translated the English words into Dinka as much as possible. If the concept could not be literally translated, she used different words, put the words in a sentence, or gave an example.[2] Although she told Redgebol that he had a right to "bring a lawyer" and that if he could not afford a lawyer, one would be "found," these differences do not materially affect the substance of Redgebol's right to provide a lawyer if he wished, or if he could not afford one, to have one provided for him. We "do not require that every

---

**2.** Abyei testified that she occasionally had to use Arabic, the national language of Sudan, to describe concepts for which no Dinka word existed. I would find this minimal use of Arabic to be reasonable, based on Abyei's testimony that Redgebol spoke to her in Arabic and appeared to understand the language; on testimony from both Abyei and Redgebol's half-brother that Arabic is commonly spoken in daily life in Sudan;

and on Abyei's testimony that it is normal to "mix the languages together sometimes" for "all of [the tribes] in the south," including the Dinka. Redgebol's half-brother's testimony that Redgebol once looked confused while watching television in Arabic and asked "something relevant, what was going on on the TV," does not indicate that Redgebol was incapable of understanding the few Arabic words that Abyei used.

bilingual effort between an officer and a suspect be perfect in order to withstand scrutiny." *People v. Aguilar–Ramos,* 86 P.3d 397, 402 (Colo.2004); *see also Mejia–Mendoza,* 965 P.2d at 782 ("acknowledg[ing] that no translation is perfect"); *cf. Prysock,* 453 U.S. at 359–60, 101 S.Ct. 2806 (stating that no "precise formulation" or "talismanic incantation" of the *Miranda* rights is required).

Nor were there communication difficulties between Redgebol and Abyei, such as those present in *Aguilar–Ramos,* upon which the majority relies. In that case, we invalidated a waiver where the interrogating detective served as the interpreter. We found that the detective's "lack of proficiency in Spanish rendered him unable to effectively communicate with" the defendant; for example, "it took the detective eight attempts to learn his suspect's name." 86 P.3d at 399, 402. Indeed, we noted that "it is evident from the disjointed nature of the questions and answers that each party frequently had no idea what the other was talking about." *Id.* at 402.[3] In contrast, Abyei spoke Dinka fluently, and she and Redgebol communicated effectively with each other. Both Abyei and Frederickson testified to that fact. Unlike in *Aguilar–Ramos,* the questions and responses in Redgebol's advisement indicated that Abyei and Redgebol understood each other.

Finally, I would find our decision in *Al–Yousif* to be instructive here, even though the case did not involve an interpreter. In *Al–Yousif,* the defendant, a native of Saudi Arabia, had lived in the United States for four years and had attended English classes. 49 P.3d at 1167. He was read his *Miranda* rights in English and waived those rights. *Id.* The trial court granted his motion to suppress, citing his limited understanding of English and his background as a native of Saudi Arabia as factors influencing his ability to understand and validly waive the *Miranda* warnings. *Id.* at 1167–68.

We disagreed, instead finding that the relevance of such cultural evidence is "limited":

Whether a defendant had the cultural background to *understand the origin or purpose of constitutional rights, or the tactical implications of waiving them, is not at issue.* A particular defendant's length of time in the country, education, religion, background, age, and intelligence certainly bear on his depth of understanding. But the relevance of those factors in the totality analysis here is limited to the simple question of whether the defendant grasped [*Miranda's* ] three precepts....

*Id.* at 1172 (emphasis added). We thus held that the defendant need only have a "minimal" understanding of his *Miranda* rights— namely, that "he did not have to talk," that "he could have an attorney present," and that "if he did talk, his statements could be used against him." *Id.* We made it clear that it is not required for the defendant "to understand the origin or purpose of constitutional rights, or the tactical implications of waiving them." *Id.* Rather, the defendant need only possess "the necessary level of rudimentary understanding." *Id.* Redgebol suggests, and the majority finds, that Abyei's translation was inadequate because she literally translated the *Miranda* advisement to Redgebol and did not have the training to provide a more in-depth understanding of *Miranda.* In my view, however, such in-depth understanding is not required under *Al–Yousif.*

### B.

While the trial court appears to have rested its decision to invalidate Redgebol's waiver on its belief that the *Miranda* warnings were not adequately translated for Redgebol, it also made comments regarding whether Redgebol understood the warnings given to him. For example, it noted that although some of Redgebol's answers were "responsive," others were "nonsensical and not directly responsive." From this finding, the majority concludes that given the vast differences between Dinka and American legal

---

**3.** We identified several additional problems with the translation, including the fact that the detective told the suspect that he had a right to "carry" silent, rather than to remain silent; that he used the word "designar" in describing the right to counsel, which has two meanings in Span-

ish—to appoint or to design; that he did not know several words in Spanish crucial to the interrogation; and that he did not understand that the suspect was asking him questions about his right to an attorney. *Aguilar–Ramos,* 86 P.3d at 399.

cultures, it was not possible for Redgebol to understand the *Miranda* advisement given to him. The majority points out, for example, that in the Dinka culture, there is no right to remain silent (instead, Dinka culture recognizes the "right to tell the truth"); there is no concept of using a statement against a defendant in a court of law; and there are no lawyers. Maj. op. at 98. The majority additionally notes that Redgebol was not informed of the fundamental differences between the American and Dinka systems. *Id.* at 91.

We considered in *Al–Yousif* the role that a defendant's cultural background plays in determining whether he adequately understood the *Miranda* warnings. As noted above, we held that a defendant's cultural background is relevant only to the extent that it bears on whether he "minimally" understood *Miranda's* three precepts—that "he did not have to talk," that "he could have an attorney present," and that "if he did talk, his statements could be used against him." 49 P.3d at 1172. We concluded that he need only have this "necessary level of rudimentary understanding" of *Miranda. Id.* Applying this standard here, Redgebol had the "necessary level of rudimentary understanding" of *Miranda.*

Frederickson spent over twenty minutes discussing Redgebol's rights with him. Indeed, on numerous occasions, when Redgebol began to talk about the investigation, Frederickson interjected to ensure that Redgebol truly wanted to waive his rights before speaking. Both Frederickson and Abyei testified that they believed Redgebol understood his rights. He understood the seriousness of his predicament and the possibility that he would be going to jail. He understood that a lawyer was "somebody who is [his] defense" and he rejected the idea of remaining silent, stating multiple times that he wanted to talk. In fact, Redgebol grew frustrated with Frederickson for asking again whether he wanted to talk, stating that he had already agreed and had signed the waiver form accordingly.

It is also true that, as the trial court pointed out, some of Redgebol's answers were nonsensical. However, the vast majority of his answers were responsive and demonstrated that he understood what was being said to him. Although Redgebol may have been confused about particular concepts at times during the interview, the relevant inquiry is whether his confusion was resolved and he understood his rights at the time he waived them. For example, Frederickson testified that Redgebol "did express a little bit of confusion" about his right to counsel, but that "he did ask appropriate questions" and that the issue was "cleared up." Redgebol was initially confused about his right to an attorney and the timing of when the attorney would arrive. He stated that he did not understand how obtaining an attorney would work if he did not have money to pay for the lawyer, and that he did not understand who would be questioning him. Frederickson made it clear that Redgebol could request a lawyer as one of his rights, telling Redgebol that the lawyer would not automatically come unless Redgebol requested one. Frederickson explained that it would be Frederickson who would be doing the questioning, not a lawyer, and that Redgebol did not have to pay for a lawyer or talk to Frederickson without a lawyer present. Redgebol then stated that he understood his rights. It is evident from the dialogue between Frederickson and Redgebol that although Redgebol may have been confused at first, his confusion was resolved and he had the "necessary level of rudimentary understanding" of his rights at the time he waived them.

Beyond Redgebol's cultural background, the majority finds that his "limited intellectual ability" resulted in his inability to make a knowing and intelligent waiver. Maj. op. at 97–98. In this case, however, the trial court found that Redgebol's intelligence was not an issue, stating that his "mental capacity was [not] so diminished that he was unable to perceive the situation." Because this ruling was adverse to the defendant, we have no jurisdiction to address it in an interlocutory appeal under C.A.R. 4.1. *See, e.g., People v. Oates,* 698 P.2d 811, 815 n. 5 (Colo.1985); *People v. Barton,* 673 P.2d 1005, 1006 n. 1 (Colo.1984).

Moreover, because the trial court found that Redgebol's intellectual ability did not

affect his capacity to waive his *Miranda* rights, I disagree with the majority's analogy to the defendant in *People v. Jiminez,* 863 P.2d 981 (Colo.1993). The majority states that "the defendant in *Jiminez* was found to function at a very low cognitive level" and that "Redgebol, although oriented in time and place to his situation and surroundings, was similarly limited in his ability to understand the *Miranda* advisement." Maj. op. at 98. In *Jiminez,* a psychologist testified that the defendant functioned at the level of a six-year-old child. 863 P.2d at 982. Further, Jiminez had never been to school, had a very limited vocabulary even in his native Kickapoo, understood only some English and Spanish, and did not understand concepts such as "rights," "lawyer," or "jury." *Id.* In *Al–Yousif,* we distinguished *Jiminez* on the grounds that in that case, the defendant's difficulty with understanding his rights was not cultural, but was based on his mental disability. *Al–Yousif,* 49 P.3d at 1172 n. 4. That same distinction applies here.

## C.

I would conclude that Frederickson did all that he could do to ensure that Redgebol properly understood the situation facing him. To exclude a validly obtained confession would serve no purpose here because there was nothing more that the detective could have done. *See Al–Yousif,* 49 P.3d at 1170. Ultimately, Redgebol possessed the "necessary level of rudimentary understanding" of *Miranda's* three precepts and waived his *Miranda* rights, choosing to speak to Frederickson. Accordingly, I would reverse the trial court's ruling on this issue.

## II.

I also disagree with the majority's conclusion that Redgebol's request for an attorney was not properly honored. If the suspect invokes his right to counsel, there can be no questioning until an attorney is present, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the accused initiates further communication with the police, and reinterro-

gation follows, then the prosecution must show that subsequent events indicated a waiver of the right to have counsel present. *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). The waiver must be knowing, intelligent, and voluntary under the totality of the circumstances, including the fact that the suspect, not the police, reopened the dialogue. *Id.* (citing *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. 1880).

Even assuming, *arguendo,* that his request for an attorney was clearly made, Redgebol initiated further discussion with the police and thereafter validly waived his right to counsel. *See, e.g., Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). A suspect's request for the assistance of counsel is not irrevocable. *People v. Martinez,* 789 P.2d 420, 422 (Colo.1990). He may later rescind that decision by initiating further communication with the police, whenever that communication may take place. *Id.* An accused initiates further communication when his comments "evince [ ] a willingness and a desire for a generalized discussion about the investigation." *Id.* (citing *Bradshaw,* 462 U.S. at 1045–46, 103 S.Ct. 2830).

Here, the majority holds that once Redgebol requested an attorney, the detective should have left the room until the attorney arrived. Maj. op. at 100. This conclusion overlooks the fact that Redgebol voluntarily initiated further communication with Frederickson. As soon as Abyei told Frederickson that Redgebol wanted a lawyer, Frederickson stopped the interrogation and began to leave the room:

> **Frederickson:** He would like a lawyer? Okay. Then I will stop. I forgot to say what time it was when we started this. We began this tape about 5:10 p.m. on June 23, 2004, and Sebet has just indicated that he would like a lawyer before any questioning.

Redgebol then initiated further discussion with Frederickson, explaining that he was confused about the process of obtaining an attorney and about the timing of the lawyer's arrival:

> **[Abyei]:** He said, "I don't understand. Will you be questioning me, then after you

go, the lawyer comes? Or will both of you be here, you and the lawyer?"

Frederickson answered Redgebol's question and again attempted to end the interview:

**Frederickson:** The lawyer is not here right now, Sebet. So I will question you later, once a lawyer has been appointed for you.

Redgebol then waived his right to have a lawyer appointed for him:

**[Abyei]:** He says he can talk with you now.

Despite Redgebol's clear decision to speak with Frederickson without a lawyer present, Frederickson made sure that Redgebol understood what he was waiving:

**Frederickson:** Without a lawyer?

**[Abyei]:** Yes, yes. He can talk with you now.

Frederickson then asked clarifying questions to ensure that Redgebol understood that he could request a lawyer and that he did not have to talk without a lawyer present. Redgebol again stated, "Let him ask me without any lawyer." Frederickson then reread Redgebol his right to have an attorney appointed for him, and Redgebol again stated that he understood. In my view, under these facts, Redgebol clearly initiated further communication with Frederickson and waived his right to have an attorney present.[4]

Unlike the majority, I would decline to read into the privilege against self-incrimination a requirement that an officer ignore a suspect's initiation of further communication until a specific period of time has passed since the suspect invoked his right to counsel. Rather, our caselaw establishes that our inquiry is only whether the suspect's comments "evince [ ] a willingness and a desire for a generalized discussion about the investigation," *Martinez*, 789 P.2d at 422, and whether the suspect thereafter validly waives his right to an attorney. Under the facts in this case, Redgebol voluntarily initiated fur-

ther communication and gave a knowing and intelligent waiver of his rights. I would therefore find that the trial court erred in suppressing Redgebol's statements on this ground.

### III.

For the foregoing reasons, I would reverse the trial court. I would hold that Redgebol's waiver was knowing and intelligent because his *Miranda* rights were adequately translated to him and because he had the "necessary level of rudimentary understanding" of those rights as required by *People v. Al–Yousif*, 49 P.3d 1165, 1172 (Colo.2002). Further, I would find that after requesting a lawyer, Redgebol voluntarily initiated further communication with the detective and thereafter validly waived his right to counsel. His statements were admissible. I therefore respectfully dissent.

I am authorized to state that Justice RICE and Justice COATS join in this dissent.

---

4. Contrary to the majority's finding, *see* maj. op. at 100, the facts of this case make our recent decision in *People v. Bradshaw* inapposite. In *Bradshaw*, which involved a sexual assault investigation, we held that the suspect clearly invoked his right to counsel by saying, "I'm going to have to talk to an attorney about this." 156 P.3d 452, 457 (Colo.2007). The officer then continued the

interrogation, asking whether the sexual encounter was consensual. *Id.* at 454. We held that the officer's failure to stop communication about the investigation violated the suspect's invocation of his right to counsel. *Id.* at 459. In contrast, when Redgebol requested an attorney, Frederickson said, "He would like a lawyer? Okay. Then I will stop."